**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

MARTIN JAMES KIPP,
*Petitioner-Appellant*,

v.

RON DAVIS, Warden, California
State Prison at San Quentin,
*Respondent-Appellee.*

No. 16-99004

D.C. No.
2:99-cv-04973-
AB

OPINION

Appeal from the United States District Court
for the Central District of California
Andre Birotte, Jr., District Judge, Presiding

Argued and Submitted March 28, 2019
San Francisco, California

Filed August 19, 2020

Before: Richard A. Paez, Mary H. Murguia, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Paez;
Dissent by Judge Nguyen

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel reversed the district court's denial of Martin James Kipp's habeas corpus petition challenging his California conviction and death sentence for the first degree murder and attempted rape of Antaya Yvette Howard in Orange County, in a case in which Kipp claimed that the trial court violated his due process right to a fair trial by erroneously admitting "other acts evidence" of the unadjudicated murder and rape of Tiffany Frizzell in Los Angeles County.

Concluding that Kipp could not overcome the strong presumption that the state court adjudicated his due process claim, the panel rejected Kipp's argument that de novo review should apply, and instead applied AEDPA's section 2254(d). The panel concluded that the state court's determination that there was a "highly distinctive pattern" between the Howard and Frizzell crimes was an unreasonable determination of facts under AEDPA section 2254(d)(2) in two ways: (1) the state court misstated the record in making a finding about the state of Frizzell's body as being unusually similar to Howard's with regard to their breasts being exposed, a misapprehension that is central to Kipp's claim; and, more importantly, (2) the state court apparently ignored evidence that supported Kipp's claim that the Frizzell and Howard crimes were too dissimilar to

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

support an inference of connection by common identity or intent.

Because the state court's denial of Kipp's due process claim was based on an unreasonable determination of the facts under section 2254(d)(2), the panel proceeded to resolve the due process claim without the deference AEDPA otherwise requires. The panel concluded that the trial court's admission of the Frizzell evidence deprived Kipp of a fundamentally fair trial in violation of his due process rights; and that Kipp was prejudiced as to the first degree murder and attempted rape charges, as well as the special circumstance finding.

The panel remanded with instructions to issue a conditional writ of habeas corpus.

Dissenting, Judge Nguyen wrote that there is no support for the majority's assumption that the state court failed to consider material evidence favorable to the defense; and even if the California Supreme Court's determination of the facts was unreasonable, the majority wrongly concludes that Kipp suffered actual prejudice.

## COUNSEL

Celeste Bacchi (argued), Mark R. Drozdowski, and Jennifer Hope Turner, Deputy Federal Public Defenders; Hilary Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Randall D. Einhorn (argued) and Ronald A. Jakob, Deputy Attorneys General; Ronald S. Matthias, Senior Assistant

Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, San Diego, California; for Respondent-Appellee.

---

# OPINION

PAEZ, Circuit Judge:

Martin James Kipp was tried in 1987 for the first degree murder and attempted rape of Antaya Yvette Howard in Orange County. Over Kipp's objection, the trial court allowed the prosecution to present evidence of an unadjudicated murder and rape in Los Angeles County. The prosecution relied on this "other acts evidence" to show the identity of Howard's killer and intent to commit rape and to kill. After the guilt phase of the trial, the jury returned a guilty verdict and, after the penalty phase, it returned a verdict recommending death. The California Supreme Court affirmed Kipp's conviction and death sentence on direct appeal. It subsequently denied his two state habeas petitions.

Kipp filed a federal habeas petition, asserting a number of constitutional claims. The district court denied all the claims but issued a certificate of appealability on Kipp's claim that the erroneous admission of the other acts evidence violated his due process right to a fair trial. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). Because the state court made a crucial erroneous factual determination in linking the two crimes and apparently failed to consider the entire record, we conclude that the California Supreme Court's decision finding no due process violation was based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). We also conclude that the

admission of the evidence constituted a due process violation that prejudiced Kipp. We therefore reverse the district court's denial of Kipp's habeas petition and remand with instructions to issue a conditional writ of habeas corpus.[1]

## I.

## A.

On January 4, 1984, nineteen-year-old Antaya Yvette Howard was found dead in her orange Datsun car in Huntington Beach, Orange County. She was estimated to have been killed on or about December 30, 1983. We briefly provide the facts of the night leading up to Howard's murder as presented at trial, drawing from the California Supreme Court's opinion on direct review, *People v. Kipp*, 956 P.2d 1169 (Cal. 1998), and the trial and state habeas records.

On the evening of December 29, 1983, after 10 p.m., Howard drove to a bar in Huntington Beach called the Bee Hive. The defendant, Kipp, age 25 at the time, also went to the Bee Hive that night. He was staying temporarily in the apartment of his childhood friend, Kenton Wheeler, who lent Kipp his sweater. The bartender at the Bee Hive recognized

---

[1] Kipp raised five uncertified claims in his opening brief: (1) trial court's failure to dismiss a potential juror for bias; (2) ineffective assistance of counsel during voir dire; (3) juror misconduct during guilt phase deliberations; (4) cumulative error; and (5) ineffective assistance of counsel during the penalty phase. Pursuant to Ninth Circuit Rule 22-1(e), we construe this as a motion to expand the certificate of appealability to include these claims. We ordered supplemental briefing on those five issues. We grant the certificate of appealability as to all five claims, but because we grant relief on Kipp's due process claim, we have no need to address the merits of those other claims at this time.

Howard and Kipp as previous customers, but she had not seen them together before.

In the Bee Hive, Kipp sat at the bar next to Howard and they started to talk and drink beer. At around 1:15 a.m., Kipp and Howard left the bar together, returning at around 1:45 a.m. Both were showing the effects of alcohol or some other intoxicating substance, but neither appeared extremely high, and Kipp seemed less impaired than Howard. Kipp and Howard each wanted another beer, but the bartender refused to serve them because they had missed the last call for drinks.

Kipp and Howard departed and were next seen at Charlie's Chili, an all-night restaurant in Newport Beach. There, between 2 and 4 a.m., Kipp and Howard drank a bottle of champagne in the company of a man with sandy hair. Eventually, the sandy-haired man left by himself in his own car. One witness, a restaurant customer, later testified that Kipp and Howard left in Howard's car, with Kipp driving. Another witness, a restaurant employee, testified that Kipp and Howard walked toward the beach after leaving the restaurant. Howard did not return home that night and was never seen alive again.

At around 7 a.m. on December 30, a woman noticed a car parked in an alley behind her Huntington Beach house. This car eventually proved to be Howard's, after the same woman notified the police a few days later because the car emitted a strong odor. When Wheeler returned to his apartment at 4:30 p.m. on December 30, he found Kipp in the shower. The sweater Kipp had borrowed was soiled and stained on the front and arms, and the room in which Kipp had slept held a very strong and sour body odor. Kipp immediately moved out and checked in at a hotel, where he stayed only one night.

On January 6, 1984, Kipp turned himself in to the Laguna Beach Police Department on traffic warrants. On January 10, the Huntington Beach Police Department interviewed Kipp and arrested him for the murder of Howard. The Orange County Public Defender was originally appointed to represent Kipp in the Howard case but, due to a conflict of interest, the trial court substituted in James Egar in April 1984.

Separately, on September 17, 1983, Tiffany Frizzell was found dead in a motel room in Long Beach, Los Angeles County. After being charged with the Howard homicide, Kipp was also charged with the Frizzell homicide in Los Angeles County. In August 1984, Egar was appointed to represent Kipp in the Frizzell case as well.

Egar conducted the preliminary hearings in both cases and applied for funding for investigation and to retain experts. In late 1985, Egar learned that his paralegal was having a romantic affair with his client Kipp. Egar subsequently dismissed the paralegal, which led to a breakdown in the attorney-client relationship and prompted Egar to withdraw from representing Kipp in the Frizzell case. In April 1986, Kipp requested that Egar be relieved as counsel in the Howard case, which the trial court granted. The court appointed Michael Horan to represent Kipp in the Howard case. Separate counsel was appointed to represent Kipp in the Frizzell case.

In the Howard case, Kipp was charged with first degree murder (Count One), rape (Count Two), and attempted rape (Count Three). The First Amended Information also alleged the special circumstance that Kipp committed the murder with the intent to kill while he was engaged in the rape or attempted rape of Howard.

About a month prior to trial, the prosecutor moved to admit evidence of the unadjudicated rape and murder of Frizzell as "other acts evidence" under California Evidence Code section 1101(b) to show the identity of Howard's killer and Kipp's intent to commit rape and to kill. The prosecutor argued that the Frizzell evidence avoided the ban on presenting evidence of a criminal defendant's character or prior conduct because "the Howard murder bears the same signature as the Frizzell murder" and was therefore admissible under section 1101(b).

The defense vigorously opposed admission of the Frizzell evidence, pointing out the differences between the two crimes and arguing that there was no distinctive "calling card." At a hearing on the motions, the trial court noted that "it's a very close call" and a "tough question," but ultimately granted the prosecution's motion to admit the evidence.

Kipp's trial began in mid-July 1987. In its opening statement, the prosecution discussed the Frizzell homicide, asserting that the evidence from the Frizzell case "is intended to show that the defendant killed [Antaya] Yvette Howard. That he intended to rape her; and that he intended to kill her. And that he did kill her." The prosecution then presented witnesses who testified to the facts leading up to Howard's disappearance and discovery, recounted above.

The prosecution also called further witnesses who testified as to the following about the crime scene.[2]

_____

[2] We grant Kipp's motion requesting that we take judicial notice of prosecution exhibits 2, 23, 31 and 71, which are photographs of Howard before her death, Howard at the scene where her body was discovered, the jeans that Howard was wearing at the time of her death, and the body of Frizzell, respectively. These exhibits were admitted into evidence at the Orange County trial. "[W]e 'may take notice of proceedings in other

Howard's body was found in her car in the hatchback area containing some trash. There was a sack that contained beer cans and a couple of straws, although no residue of narcotics were detected inside of them. Her body was covered by a blanket, on top of objects like hubcaps and other shoes. Her blouse had been pulled back and was missing a button, although the investigating officer at the scene reported observing no "violence to the blouse." Howard's bra was still clasped but was twisted and above her breasts. There were no shoes on Howard's feet. Her jeans and underwear were around her ankles. There was mud and dirt on the knees, the left side, and the back of the jeans, and also on the upper left part of Howard's body.

The autopsy surgeon testified that the cause of Howard's death was asphyxiation due to strangulation, with blunt force injury to the head as a contributing factor. A criminalist testified about tests conducted for signs of seminal fluid or spermatozoa, which would indicate the possibility of sexual intercourse or assault. No seminal fluid or spermatozoa was detected; the criminalist stated that that could indicate either no presence to begin with, or that it could have evaporated, decomposed, and disappeared. A pathologist also examined Howard's genital and vaginal areas to look for evidence of sexual assault, like tears, lacerations, deep bruising or any other injuries, but found no evidence of trauma. He did not find defensive wounds on Howard's body, but testified there

---

courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.'" *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (quoting *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979)).

could have been superficial trauma that could have been "readily masked" by decomposition of the body.

The prosecution also introduced evidence of the Frizzell homicide, which took up almost two days of the four-day trial. Of the 32 witnesses who testified, 15 witnesses related to the Frizzell case, including Frizzell's mother. The court instructed the jury that it could consider the Frizzell evidence for the limited purpose of determining whether it tends to show:

> a characteristic method, plan, or scheme in the commission of criminal acts similar to the method, plan, or scheme used in the commission of the offense in this case, which would further tend to show the existence of the intent . . . and special circumstance alleged, or the identity of the person who committed the crimes and special circumstance.

To sum up, the court instructed that "the [Frizzell] offense is admissible if it [warrants] an inference that if the defendant committed another act, he committed the act charged."

Frizzell's mother testified that on September 15, 1983, Frizzell flew from Seattle to Southern California where she was supposed to start school at the Brooks Fashion College in Long Beach two days later. Because the dorms had not yet opened, Frizzell stayed at the Ramada Inn in Long Beach. She spoke to Frizzell by phone on September 15 and 16. On September 17, an employee at the Ramada Inn found Frizzell's dead body on the bed in her rented room. Officers testified to finding Frizzell's semi-clad body laying on the bed, under the bedspread, with a garment over her face. Her bra was missing, and she was nude from the waist down.

The blanket, bedsheets, and pillows on the bed were undisturbed, and there seemed to be no indication of a struggle on the bed.

The prosecution's witnesses also testified to the following: Frizzell's death was caused by ligature strangulation, having been strangled by a belt that was around her neck. Semen and sperm were found in Frizzell's vagina and external genital area. Kipp's fingerprint was found on a telephone in the room. A few days later, a canvas bag containing clothing and other personal property belonging to Frizzell was found in some bushes at a Long Beach residence, and one of the objects in the bag, a book, also bore Kipp's fingerprints. The following month, Kipp pawned a radio that had belonged to Frizzell.

After the prosecution rested, the defense moved under California Penal Code section 1118 for the trial court to order a judgment of acquittal based on insufficient evidence. The court granted the motion in part and denied it in part. The court dismissed Count Two after concluding there was not enough evidence to show actual rape of Howard. The court stated, however, that the photographs of Howard, the position of her clothing, and the Frizzell evidence were sufficient to sustain a verdict of attempted rape and the special circumstance of murder during attempted rape.

In its case, the defense made no opening statement and presented one witness, a toxicologist who testified to the presence of cocaine or a cocaine metabolite in Howard's blood.

In closing statements, the prosecution referred to the Frizzell evidence and Howard evidence interchangeably throughout its argument. The prosecutor implied that Kipp knew how to kill Howard because he had done it before,

through strangulation of Frizzell.  He acknowledged that there was not enough evidence of actual rape of Howard, but pointed out that there was proof of rape in Frizzell's case. He also pointed out that even though there was no sign of defensive wounds on Howard's body, "you've got bruises on Tiffany [Frizzell]."  He concluded that the evidence of a prior rape and murder "[wa]s about as strong evidence as you're ever going to get that [Kipp] intended to kill [Howard]."

In its closing, the defense argued that there was little evidence to support the charges without the Frizzell case, pointing out "[t]he biggest piece of evidence he has, to be honest with you, is that incident in Long Beach."

The jury deliberated over three days, for a total of about seven hours.  On August 14, 1987, the jury returned a verdict, finding Kipp guilty of first degree murder and attempted rape and finding the attempted rape special circumstance to be true.

The penalty phase began on August 19 and ended on August 21.  The jury deliberated over two days before returning a verdict recommending death.  On September 18, 1987, the trial court sentenced Kipp to death.[3]

## B.

Kipp appealed his conviction and sentence with new counsel.  The direct appeal included claims based on the

---

[3] After the Orange County trial, Kipp was separately convicted and sentenced to death for the rape, robbery, and murder of Frizzell in 1989 in Los Angeles County.  *People v. Kipp*, 33 P.3d 450, 458 (Cal. 2001). This case is the subject of an appeal before us, which we resolve in an opinion concurrently published under Case No. 15-99020.

erroneous introduction of the Frizzell evidence at the guilt phase of the trial, ineffective assistance of trial counsel during voir dire, the trial court's failure to sua sponte dismiss a potential juror for cause, and cumulative error. In 1998, the California Supreme Court affirmed Kipp's convictions and sentence in a reasoned opinion. *Kipp*, 956 P.2d at 1174. The California Supreme Court also denied Kipp's petition for rehearing. In December 1996, Kipp filed a habeas petition in the California Supreme Court while his direct appeal was pending. In addition to his claims on direct appeal, Kipp raised additional claims of juror misconduct and ineffective assistance of counsel during the penalty phase. The court summarily denied the habeas petition in April 1999.

In April 2000, Kipp, now represented by the Federal Public Defender, filed an "exhaustion" state habeas petition in the California Supreme Court, raising all claims relevant to this appeal, including more evidentiary support than was previously available in his first habeas petition. The California Supreme Court issued an order on February 19, 2003, stating without explanation: "Each claim is denied on the merits for failure to state a prima facie case for relief."

Kipp filed his initial federal petition in March 2000. The district court stayed federal proceedings pending the state exhaustion proceedings. Two days after the California Supreme Court denied his second state habeas petition, Kipp filed an amended petition.

In March 2005, Kipp filed a motion for evidentiary hearing on certain claims. The district court granted an evidentiary hearing on three ineffective assistance of counsel claims related to the penalty phase, mental state defense, and use of experts. In the same order, the district court denied Kipp's claims regarding the admission of the Frizzell

evidence, ineffective assistance of counsel during voir dire, the trial court's failure to excuse a potential juror for bias, and juror misconduct.[4]   The district court conducted an evidentiary hearing from December 1 through December 4, 2009.  Following the United State Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011), the district court recognized that it was foreclosed from considering any new evidence presented at the evidentiary hearing, and denied all three remaining ineffective assistance of counsel claims.  In March 2016, the district court denied all other remaining claims, including the claim of cumulative error. Kipp timely appealed.

## II.

We review de novo a district court's decision to grant or deny a writ of habeas corpus.  *Poyson v. Ryan*, 879 F.3d 875, 887 (9th Cir. 2018) (citing *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007)).   We review the district court's findings of fact for clear error.  *Id*.

Habeas petitions filed after April 24, 1996 arising out of criminal proceedings in state court, as is the case here, are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *Id*.   Under AEDPA, if a claim was "adjudicated on the merits in [s]tate court proceedings," a

---

[4] The district court applied no procedural bars to Kipp's claims and decided all claims on the merits.  Because Kipp raised and briefed all the claims presented to us on direct appeal or state post-conviction proceedings, we conclude that he "'fairly presented' his federal claim[s] to the highest state court" and has satisfied the exhaustion requirement. *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)).

federal court may only grant habeas relief on either of two grounds if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

To determine whether section 2254(d) deference applies, we must first identify the appropriate state court decision to review. We look "to the last reasoned decision" that resolves the claim at issue in order to determine whether that claim was adjudicated on the merits. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991). A state court may decide a habeas claim on the merits "unaccompanied by an explanation" of its reasoning. *Harrington v. Richter*, 562 U.S. 86, 98 (2011). This "*Richter* presumption" can be rebutted "in some limited circumstances." *Johnson v. Williams*, 568 U.S. 289, 301 (2013).

When the state's highest court does not provide reasoning for its decision, a federal habeas court may "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Where no decision from the state court explains its underlying reasoning, we must "engage in an independent

review of the record" to determine whether the state court's decision was "objectively unreasonable." *Murray v. Schriro* ("*Murray II*"), 882 F.3d 778, 802 (9th Cir. 2018) (quoting *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013)). This is not de novo review; rather, we must determine what arguments could have supported the state court's decision and assess whether fairminded jurists could disagree whether those arguments are unreasonable. *Id.*

For claims adjudicated on the merits in state court, AEDPA sets a "difficult" standard to meet. *Richter*, 562 U.S. at 102. The first ground for AEDPA relief may only be met by reference to holdings, rather than dicta, of the Supreme Court published "as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). An "unreasonable application" of clearly established law must be "more than incorrect or erroneous"; the state court's application of Supreme Court precedent must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (quoting *Williams*, 529 U.S. at 409–10). "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," AEDPA precludes federal habeas relief. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The second ground for federal habeas relief may only be met with reference to the evidence in the record before the state court. *Pinholster*, 563 U.S. at 181–82. As long as "'[r]easonable minds reviewing the record might disagree' about the finding in question," AEDPA prevents federal habeas relief. *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).

"If the claim was not 'adjudicated on the merits' by the state court, the review is to be *de novo*." *Amado v. Gonzalez*,

758 F.3d 1119, 1130 (9th Cir. 2014) (quoting *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002)).  Where a state court has adjudicated a claim on the merits with a written decision denying relief based on one element of the claim and, therefore, does not reach the others, the federal court gives section 2254(d) deference to the element on which the state court ruled and reviews de novo the elements on which the state court did not rule.  *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

## III.

On appeal, Kipp raises five claims related to the guilt phase of the trial and one related to the penalty phase.  Here we address only the merits of Kipp's due process claim.[5]

Kipp argues that his due process right to a fair trial was violated by the introduction of extensive evidence concerning the unadjudicated rape and murder of Frizzell to prove Kipp's intent and identity as the perpetrator of the charged offenses involving Howard.  According to Kipp, the lack of distinctive similarities between the two offenses made it impossible for the jury to draw a permissible inference that the person who killed Frizzell was likely the same person who killed Howard or was acting with the same intent.  Instead, the Frizzell evidence supported only an impermissible inference of propensity:  that Kipp likely raped and killed Frizzell, and was thus the sort of person of bad character who would also have raped and killed Howard.  Kipp argues that the erroneous admission of the Frizzell evidence deprived him of his due process right to a fair trial because it relieved the prosecution of its burden of proving

---

[5] As noted above, *supra* at n.1, we have no need to reach the merits of the other five, previously uncertified claims.

him guilty of Howard's murder and attempted rape beyond a reasonable doubt.  He further argues that the error was prejudicial because the case against him was entirely circumstantial and the Frizzell evidence was highly inflammatory.

We conclude that the California Supreme Court's decision to affirm admission of the Frizzell crime was based on an unreasonable determination of the facts in light of the evidence presented to the state court.  The admission violated Kipp's due process right to a fair trial and prejudiced him as to both charges and the special circumstance.  We therefore reverse the district court's denial of habeas relief and remand with instructions to issue a conditional writ of habeas corpus.

## A.

Before analyzing Kipp's claim, we must first decide the proper standard of review, which is rigorously contested by the parties.  Because we are obliged to apply the correct standard, the issue of the proper standard by which to review Kipp's habeas claim is "non-waivable."[6]  *Amado*, 758 F.3d at 1133 n.9.  Kipp argues that de novo review should apply because the California Supreme Court never ruled on the merits of his due process claim.  The Warden argues that the California Supreme Court decided the claim on the merits in its reasoned decision on direct appeal when it concluded that the admission of the Frizzell evidence did not violate California's evidentiary rules.

---

[6] The Warden's assertion that Kipp waived the argument for de novo review is therefore inapposite.

In its opinion on direct review, the California Supreme Court did not explicitly address or acknowledge Kipp's due process claim. On the one hand, this is striking because California Supreme Court decisions addressing similar claims typically do address the due process claim separately from the evidentiary claim. *See*, *e.g.*, *People v. Gordon*, 792 P.2d 251, 260 n.2 (Cal. 1990). In Kipp's case, however, the state court only reviewed for abuse of discretion the trial court's decision to admit the evidence under California Evidence Code sections 1101 and 352.[7] On the other hand, we have interpreted the Supreme Court's decisions in *Williams* and *Richter* to create a strong presumption that the state court's extensive discussion of Kipp's claim as an evidentiary ruling under California state law was a ruling on the federal constitutional claim as well. *See Murray II*, 882 F.3d at 810 (citing *Williams*, 568 U.S. at 298, 305; *Richter*, 562 U.S. at 98–100).

In many ways, Kipp's case is analogous to *Williams*. In that case, the petitioner argued that the discharge of a certain juror violated both the Sixth Amendment and the California Penal Code. 568 U.S. at 295. Looking to the last reasoned decision, we originally held that the California state court either overlooked or disregarded the Sixth Amendment claim because the state court extensively discussed the propriety of the dismissal under California state law without expressly acknowledging whether it was also deciding a Sixth Amendment issue. *Id*. at 296–97. The Supreme Court

---

[7] Section 1101 prohibits the admission of character or other acts evidence to prove a defendant's conduct on a specified occasion with certain exceptions, including to prove intent or identity. CAL. EVID. CODE § 1101(a)–(b). Section 352 requires the court to weigh the probative value of proffered evidence against danger of undue prejudice, confusion or misleading the jury. *Id*. § 352.

reversed our decision, explaining there are several reasons why state courts may not discuss separately every single claim: first, the line of state precedent could be viewed to fully incorporate a related federal constitutional right; second, the state court might consider a reference to the U.S. Constitution or federal precedent as too "fleeting" to sufficiently raise a federal claim; and third, the state court may simply disregard the claim as too insubstantial to merit discussion. *Id*. at 298–99. Pointing out how California state law seemed to incorporate federal constitutional law regarding juror impartiality, *id*. at 304–06, the Court concluded that it was "exceedingly unlikely" that the state court overlooked the petitioner's federal claim and remanded for us to apply AEDPA deference. *Id*. at 306.

Some of the factors discussed in *Williams* cut the other way in Kipp's case to support de novo review. First, Kipp's argument involved more than a "fleeting reference" to the due process clause; on direct appeal, he fully briefed that claim separately from the state evidentiary claim. Second, the due process claim is neither insubstantial nor frivolous, given the highly prejudicial nature of the Frizzell evidence. Third, the California Supreme Court's discussion of the merits of the evidentiary claim does not refer to federal precedent.

Applying *Murray*'s interpretation of *Williams* and *Richter*, we nonetheless conclude that Kipp cannot overcome the strong presumption that the state court adjudicated his federal claim. As we have noted before, "it is 'difficult to imagine' the [state supreme court] 'announcing an interpretation of' [its state evidentiary rule] 'that it believed to be less protective than' the Fourteenth Amendment, 'as any such interpretation would provide no guidance to state trial judges bound to follow both state and

federal law.'" *Murray II*, 882 F.3d at 810–11 (quoting *Williams*, 568 U.S. at 305); *see also Phillips v. Herndon*, 730 F.3d 773, 775–77 (9th Cir. 2013) (holding that the state court's holding on California Evidence Code section 1230 regarding third-party confessions was at least as protective as the federal standard).

Indeed, the relevant California evidentiary rule is nearly identical to its federal counterpart. California Evidence Code section 1101(b) provides:

> Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as *motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident*, . . . ) other than his or her disposition to commit such an act.

(emphasis added). For comparison, Federal Rule of Evidence 404(b) states:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character . . . [but t]his evidence may be admissible for another purpose, such as *proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident*.

(emphasis added).

The Supreme Court found no due process violation where other acts evidence was properly admitted under Rule 404(b) in *Dowling v. United States*, 493 U.S. 342, 353–54 (1990). Given the "overlapping nature" of Kipp's due process and evidentiary clams, "it is improbable that the state court simply neglected the federal issue and failed to adjudicate the constitutional claim." *Bell v. Uribe*, 748 F.3d 857, 864 (9th Cir. 2014).

We therefore apply AEDPA's section 2254(d) to Kipp's due process claim.

## B.

Alternatively, applying AEDPA, Kipp argues that the state court's decision was based on an unreasonable determination of the facts for purposes of section 2254(d)(2).[8] Assuming that the California Supreme Court's decision on the state evidentiary claim also addressed the federal due process claim, the court concluded there was no due process violation because the Frizzell and Howard crimes "revealed a highly distinctive pattern" "to support a rational inference of identity, common design or plan, or intent." *Kipp*, 956 P.2d at 1181–82. The state court reached this conclusion by pointing out eight "shared characteristics"

---

[8] Kipp does not argue for error under section 2254(d)(1) because there is no clearly established law that addresses whether the admission of a defendant's criminal history or prior bad acts would violate due process. *See Alberni v. McDaniel*, 458 F.3d 860, 864, 866 (9th Cir. 2006). The Supreme Court has expressly reserved the question of whether using evidence of a defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process. *Estelle v. McGuires*, 502 U.S. 72, 75 n.5 (1991).

between the two crimes: (1) the victims' young age;[9] (2) the victims' gender; (3) strangulation; (4) the victims' bodies were carried to an enclosed area belonging to the victims; (5) both bodies were covered with bedding (Howard with a blanket and Frizzell with a bedspread); (6) garment was found on the victims' upper bodies while their breasts and genital areas were unclothed; (7) the victims' clothing was not torn; and, (8) the victims' legs had bruises.[10]

Some of these characteristics are unfortunately generic features of many rape-murders. Of the eight characteristics identified by the state court, the one identified similarity that appears unusually distinct—the fact that both victims had their breasts exposed—is plainly contradicted by testimonial and documentary evidence in the state record. At Kipp's trial, an officer testified that Frizzell's body was found on an undisturbed bed with a garment over her face and a bedspread over the body. The prosecution submitted into evidence a photograph of Frizzell's body. The same officer testified that the photograph depicted Frizzell's body as found after removing the bedspread and garment that was over her face. In the photograph, Frizzell's body is clothed in a polo shirt and her breasts are unmistakably covered.

---

[9] The state court identified both Howard and Frizzell as 19 years old, but the record is inconclusive whether Frizzell was 18 or 19. The two ages are close enough to generalize the two victims as young women, and Kipp does not challenge this factual finding.

[10] The Warden argues there were several additional similarities— the fact that Kipp's fingerprint was found at each crime scene, that both victims had contusions, and that neither was acquainted with Kipp for a significant period of time—but we may look only to the reasoning of the California Supreme Court. *See Wilson*, 138 S. Ct. at 1193–94 (reaffirming the "look through" presumption to the last related state-court decision and reviewing the rationale in that decision).

Hence, the state court was factually wrong to conclude that both bodies were left in the unusual posture of having their breasts exposed.**[11]**

More importantly, the state court failed to mention any of the differences between the two crimes, differences that far outnumber the similarities. These include: (1) Howard was African-American and Frizzell was white; (2) Howard's body was found in her car and Frizzell's was found in her motel room; (3) there was evidence of sexual intercourse on Frizzell's body and not on Howard's; (4) Howard and Kipp were seen together socially before her death whereas there was no evidence that Kipp and Frizzell knew each other; (5) property was stolen from Frizzell and nothing was taken from Howard; (6) Frizzell was strangled by a belt (ligature strangulation) whereas Howard's death was caused by manual strangulation; (7) there was evidence that Howard was intoxicated at the time of her death but no such evidence existed as to Frizzell; (8) Frizzell's body had defensive wounds and Howard's did not; (9) Howard's body and clothes had dirt on them and Frizzell's did not; (10) Frizzell's body was discovered with a garment pulled

---

**[11]** Kipp argues that two other factual findings were erroneous, pointing out that: (1) there was no evidence that Frizzell was killed elsewhere and transported to her motel room; and (2) there was no support that the perpetrator carefully staged the victims in similar poses underneath bedding. There was, however, sufficient evidence such that "'[r]easonable minds reviewing the record might disagree' about the finding in question." *Brumfield*, 135 S. Ct. at 2277 (quoting *Wood*, 558 U.S. at 301). First, an officer testified to seeing no struggle on the bed where Frizzell was found. Fairminded jurists could disagree over whether that means she was killed somewhere else in the room, somewhere else in the hotel building, or somewhere outside the building. Second, the state court thought it was significant that both victims were found under bedding of some kind. It did not suggest that the bodies were arranged in any particular way or "staged" as Kipp argues.

over her face and Howard's body was not; (11) Frizzell's bra had been removed and taken by the killer, whereas Howard's bra was left on her body; and (12) there was evidence that Howard suffered a head injury but Frizzell did not.

While we must give deference on federal habeas, "deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). As daunting as the standard is, a federal court can disagree with a state court's credibility or other factual determination, as long as the court is guided by AEDPA. *Id*. Following *Miller-El*, we identified different "flavors" of challenges to state-court findings under section 2254(d)(2)'s unreasonableness standard.[12] *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004), *abrogated on other grounds by Murray I*, 745 F.3d at 999–1000.[13] This discussion in *Taylor*

---

[12] The Warden argues that Kipp's claim should be evaluated under the more deferential standard set out under 28 U.S.C. § 2254(e)(1). The Supreme Court has, however, explicitly "not yet 'defined the precise relationship between § 2254(d)(2) and § 2254(e)(1).'" *Brumfield*, 135 S. Ct. at 2282 (quoting *Burt v. Titlow*, 571 U.S. 12, 18 (2013)). Therefore, we must follow our circuit's precedent regarding the section 2254(d)(2) analysis. *See Murray v. Schriro ("Murray I")*, 745 F.3d 984, 1001 (9th Cir. 2014) (acknowledging confusion over whether section 2254(d)(2) or (e)(1) or both applies to AEDPA review of state-court factual findings, and concluding that where petitioner's challenges are based entirely on the state record, it would apply section 2254(d)(2)).

[13] In *Murray I*, we recognized that *Pinholster* foreclosed *Taylor*'s suggestion that an extrinsic challenge, based on evidence presented for the first time in federal court, may occur once the state court's factual findings survive any intrinsic challenge under section 2254(d)(2). *Murray I*, 745 F.3d at 999–1000. Kipp does not present an extrinsic challenge so *Murray I*'s abrogation of *Taylor* on this ground is irrelevant here.

is crucial to understanding the unreasonableness of the state court's determination in Kipp's case.

In *Taylor*, we explained first that the state court might have neglected to make a finding of fact when it should have done so. *Id*. Second, the state court might make factual findings under a misapprehension as to the correct legal standard. *Id*. at 1001. "[W]here the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable." *Id*. Third, the fact-finding process itself might be defective. *Id*. For instance, the state court might have made "evidentiary findings without holding a hearing" to give the petitioner "an opportunity to present evidence." *Id*. Alternatively, the state court might "plainly misapprehend or misstate the record in making [its] findings." *Id*. Lastly, the state-court fact-finding process may be "undermined where the state court has before it, yet apparently ignores, evidence that supports petitioner's claim." *Id*. In other words, "[f]ailure to consider key aspects of the record is a defect in the fact-finding process." *Id*. at 1008 (citing *Miller-El*, 537 U.S. at 346).

*Taylor* grappled with this last kind of defect in the state-court fact-finding process: failure to consider and weigh relevant evidence that was properly presented to the state courts. *Id*. at 1001. We acknowledged that the state court need not address "every jot and tittle of proof suggested to them." *Id*. Rather, to fatally undermine the fact-finding process, "the overlooked and ignored evidence must be highly probative and central to petitioner's claim." *Id*. We explained how consideration of all relevant evidence legitimizes the fact-finding process:

> In instructing jurors about their fact-finding function, we normally advise them to consider the entire record, not individual

pieces of evidence standing alone. This reflects the philosophy of our common-law fact-finding process, namely, that the various pieces of evidence and testimony in the record must be considered in light of all the others.

. . .

What goes for juries goes no less for judges. In making findings, a judge must acknowledge significant portions of the record, particularly where they are inconsistent with the judge's findings. The process of explaining and reconciling seemingly inconsistent parts of the record lays bare the judicial thinking process, enabling a reviewing court to judge the rationality of the fact-finder's reasoning. On occasion, an effort to explain what turns out to be unexplainable will cause the finder of fact to change his mind. By contrast, failure to take into account and reconcile key parts of the record casts doubt on the process by which the finding was reached, and hence on the correctness of the finding.

*Id*. at 1007–08 (internal citations omitted). The state court in *Taylor* "never considered or even acknowledged" the existence of a crucial piece of testimony that corroborated the defendant's account of what occurred during his interrogation. *Id*. at 1005–06. Therefore, we concluded that the state court's finding that the defendant's confession was lawfully and voluntarily obtained was objectively unreasonable. *Id*. at 1008.

Applying *Taylor*, we recently held that a state court's factual determination regarding a defendant's intent in asking to represent himself was *not* entitled to a presumption of correctness because the court disregarded relevant evidence about his request being made in good faith. *See Burton v. Davis*, 816 F.3d 1132, 1155–59 (9th Cir. 2016). We have also held that a state court's conclusion that a jailhouse informant testified truthfully at the defendant's trial was an unreasonable determination of facts because the state court arbitrarily cabined off—and thereby failed to consider—evidence of the informant's pattern of perjury. *See Maxwell v. Roe*, 628 F.3d 486, 504–05 (9th Cir. 2010). In *Brumfield*, the Supreme Court also attributed the state court's erroneous failure to hold an evidentiary hearing on petitioner's intellectual disability, in part, to the fact that the court overlooked evidence in the record about issues with the petitioner's adaptive functioning.  135 S. Ct. at 2279–82.

In Kipp's case, we conclude that the state court's determination that there was a "highly distinctive pattern" between the Howard and Frizzell crimes was unreasonable in two ways.  First, it misstated the record in making the finding about the state of Frizzell's body as being unusually similar to Howard's with regard to their breasts being exposed.  Contrary to the state court's description of the evidence, Frizzell's body was clothed and her breasts were covered.  This misapprehension involves an issue that is central to Kipp's claim and thus undermines the reasonableness of the court's determination regarding the similarity of the crimes.  *See Taylor*, 366 F.3d at 1001.

Second, and more importantly, the state court apparently ignored evidence that supported Kipp's claim that the Frizzell and Howard crimes were too dissimilar to support an inference of connection by common identity or intent.

The state court solely mentioned the similarities between the two crimes, without any acknowledgment of the differences. This stands in contrast to other cases in which the California Supreme Court weighed the number and type of similarities against the differences. *See, e.g.*, *People v. Foster*, 242 P.3d 105, 130–32 (Cal. 2010) (considering the prosecution's summary of the similarities between three robberies and assaults, and the defense's arguments against their admission); *People v. Rogers*, 304 P.3d 124, 144–46 (Cal. 2013) (weighing prosecution and defendant's arguments over the finding of similarity between three murders at issue).

In light of this factual record, we are satisfied that any appellate court would find it difficult to conclude that the similarities between the Howard and Frizzell crimes are highly unique, *unless* it completely disregards the differences as the California Supreme Court did here. *Cf. Gulbrandson v. Ryan*, 738 F.3d 976, 987 (9th Cir. 2013) ("[A] state court's fact-finding process is unreasonable under § 2254(d)(2) only if we are 'satisfied that *any* appellate court to whom the defect is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" (quoting *Taylor*, 366 F.3d at 1000)).

As was the situation in *Taylor*, the state court here completely failed to acknowledge evidence relevant to Kipp's claim regarding the numerous dissimilarities between the Howard and Frizzell crimes. We therefore conclude that the state court's fact-finding process itself was defective and renders the resulting finding that there was a highly distinctive pattern to justify admission of the Frizzell evidence unreasonable under section 2254(d)(2). *See Taylor*, 366 F.3d at 1008.

## C.

Because the state court's denial of Kipp's due process claim was based on an unreasonable determination of the facts under section 2254(d)(2), AEDPA deference no longer applies. *Maxwell*, 628 F.3d at 506. We therefore proceed to resolve Kipp's due process claim without the deference AEDPA otherwise requires. *Id*. [14]

"A federal habeas court [] cannot review questions of state evidence law." *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999). "[W]e may consider only whether the petitioner's conviction violated constitutional norms." *Id*. (citing *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991)). The general test is "whether the admission of evidence rendered the trial so fundamentally unfair as to violate due process." *Larson v. Palateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (quoting *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998)).

We have articulated a more detailed test, holding that:

> [T]he admission of other crimes evidence violate[s] due process where: (1) the balance of the prosecution's case against the defendant was "solely circumstantial;" (2) the other crimes evidence . . . was similar to the [crime] for which [the defendant] was

---

[14] We readily dismiss the Warden's argument that relief is barred by the retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). Kipp's claim about the inherent unfairness of admitting the Frizzell evidence is based on longstanding principles of due process and the right to a fair trial in which the prosecution must prove beyond a reasonable doubt every fact necessary to establish each element of the crimes charged. *See In re Winship*, 397 U.S. 358, 361–64 (1970).

on trial; (3) the prosecutor relied on the other crimes evidence at several points during the trial; and (4) the other crimes evidence was "emotionally charged."

*Garceau v. Woodford*, 275 F.3d 769, 775 (9th Cir. 2001), *rev'd on other grounds*, 538 U.S. 202 (2003) (quoting *McKinney v. Rees*, 993 F.2d 1378, 1381–82, 1385–86 (9th Cir. 1993)).[15]

In *McKinney*, we held that the admission of evidence of the petitioner's fascination with and use of knives to convict him for the stabbing of his mother violated his due process right to a fair trial. 993 F.2d at 1386. We reached this conclusion after determining that the other acts evidence was largely irrelevant because they only proved that the petitioner owned knives at various points in time, but not on the night of the murder in question. *Id.* at 1382–83. Hence, the evidence was relevant only as character evidence—to show propensity to act as someone who was fascinated with knives and led a "commando lifestyle." *Id.* at 1385; *see also Alcala v. Woodford*, 334 F.3d 862, 886–88 (9th Cir. 2003) (holding there was a due process violation where defendant was charged with murder and the prosecution admitted into evidence that police had seized from defendant's home two unused sets of kitchen knives made by same company that made the murder weapon); *Garceau*, 275 F.3d at 775–76 (holding there was due process violation where defendant

---

[15] On appeal, the Supreme Court held that we should not have applied de novo review because the petitioner's habeas petition was filed after AEDPA's effective date and therefore subject to AEDPA's requirements. *Garceau*, 538 U.S. at 210. *Garceau* is still relevant, however, for its discussion of *McKinney*, which is the controlling case over Kipp's due process claim.

was charged with double homicide and the prosecution introduced evidence that he had been convicted of murdering a different person several months after the double homicide, and the trial court's instruction to the jury expressly invited them to draw the inference of criminal propensity).

Conversely, we have found no due process violation where there *were* permissible inferences that the jury could draw from the challenged evidence. *See*, *e.g.*, *Boyde v. Brown*, 404 F.3d 1159, 1172–73 (9th Cir. 2005) (holding there was no due process violation in trial for robbery, kidnapping, and murder of a 7-Eleven store clerk where the court admitted evidence that the defendant had robbed the same 7-Eleven store and kidnapped the on-duty clerk because it showed a modus operandi); *Correll v. Stewart*, 137 F.3d 1404, 1416–17 (9th Cir. 1998) (same in trial for murder where court admitted testimony about defendant's possession of marijuana that had been stolen from the victim's home, proving essential elements of opportunity and identity); *Jeffries v. Blodgett*, 5 F.3d 1180, 1193 (9th Cir. 1993) (same in trial for two homicides by shooting where court admitted evidence that defendant had certain rifles, bullets, and handguns because one of the rifles and bullets had been stolen from the victims, and the pistols could have been the murder weapon or weapons); *Jammal*, 926 F.2d at 919–21 (same where court admitted evidence that defendant had $135,000 in the trunk of his car when he was arrested on charges of drug possession because it allowed for inference that it was the same car where a witness previously identified $47,000 in cash and drugs).

The California Supreme Court affirmed the admission of the Frizzell evidence based on its conclusion that there was a "highly distinctive pattern" between the two crimes that would lead to the permissible inference that the same person

committed both crimes with the same intent. According to the state court, this "highly distinctive pattern" involved the strangling of a young woman whose body was moved from one place to another, covered with bedding, and left with inferences of sexual assault, bruising on both legs, and genital area unclothed. While tragic, the fact pattern that linked the Frizzell and Howard crimes does not spell out a specific "signature" or modus operandi that courts have recognized. *See Loughrin v. United States*, 573 U.S. 351, 353 (2014) (trial court admitted evidence of "modus operandi" of defendant going to a local Target, posing as the accountholder, presenting an altered check of amounts up to $250 to purchase merchandise, and then returning to the store to return the goods for cash); *United States v. Gonzalez*, 533 F.3d 1057, 1063–64 (9th Cir. 2008) (same where defendant was on trial for assaulting three women and prosecution introduced testimony from two other women establishing modus operandi that entailed "being a police officer armed with a badge and a gun" who consistently approached his victims in the same manner, would establish a conversation with the victims about their families or personal relationships, would command the victims to "sit, squat, stand, or undress," and would then release them without arrest or citation); *Boyde*, 404 F.3d at 1172–73 (same involving modus operandi of robbing the same 7-Eleven and kidnapping the on-duty clerk); *Ewoldt*, 867 P.2d at 764–66 (discussing cases).

Without this level of unusual commonality between the Howard and Frizzell crimes, we conclude that there is no highly distinctive pattern that would justify an inference of the same intent or perpetrator behind both crimes. Rather, there is a high risk that a juror would have assumed that if Kipp committed the Frizzell homicide, he had the propensity to commit the Howard homicide as well. *Cf. McKinney*,

993 F.2d at 1383; *Alcala*, 334 F.3d at 887; *Garceau*, 275 F.3d at 775.

The lack of permissible inferences alone does not constitute a violation of due process necessitating a new trial. We must consider the strength of the prosecution's case against Kipp, the extent to which the other crimes evidence was similar to the crime for which Kipp was on trial, the extent to which the prosecution relied on the other crimes evidence during trial, and whether the other crimes evidence was emotionally charged. *See Garceau*, 275 F.3d at 775; *McKinney*, 993 F.2d at 1384–86.

Absent the Frizzell evidence, the case against Kipp for Howard's attempted rape and special circumstance of intent to kill during attempted rape was circumstantial. The trial court recognized this in dismissing the rape charge against Kipp at the close of the prosecution's case. Based solely on the evidence presented about the Howard crime, the jury could have at most inferred that Kipp was with Howard the night in question, and they might have had sex. Whether it was consensual and whether Kipp intended to kill her while raping her, however, is not easily deduced from the Howard evidence alone. The prosecution expressly relied on the Frizzell evidence to prove the necessary intent to rape and intent to murder while attempting to rape, and articulated this reliance in its motion to admit the Frizzell evidence and at trial.

Moreover, like in *Garceau*, where the defendant was charged with a double homicide and the trial court admitted evidence of his prior conviction for another murder, the impermissible propensity inference here was strong because the Frizzell and Howard crimes both involved rape and murder. Even worse than in *Garceau*, Kipp had not been convicted of the Frizzell crime. *Contra* 275 F.3d at 773.

Yet, the jury was exposed to extensive evidence of both crimes, such that Kipp appeared to be on trial for a double rape-homicide, without the means of defending himself against the Frizzell charges.

The prosecutor not only relied on the Frizzell evidence at several points during the trial—that evidence constituted nearly half of the entire trial. The prosecution also highlighted the Frizzell evidence throughout its opening remarks, emphasizing that evidence about Frizzell's killing was presented to show that Kipp intended to rape Howard and intended to kill her while raping her. During the prosecution's closing argument, the Frizzell evidence was discussed no fewer than twelve times, including remarks such as:

- "This is a personal case. This involved something horrible to each one of these young ladies."

- "[Howard] didn't want it. [Kipp] tried to force it on her. He tried to force it on Tiffany Frizzell. We have evidence that he did force it on her. We have semen in her vagina."

- "[H]ere you have the force and violence. I mean, you've got bruises on Tiffany [Frizzell]. You've got evidence of manual strangulation as well ligature strangulation. You look at that photograph of that little girl. That belt was tightened. I mean it was tight. She had no chance. Antaya Yvette Howard had no chance."

Last, it is self-evident that the Frizzell evidence was "emotionally charged." *McKinney*, 993 F.2d at 1385. Not only did Frizzell's mother testify, but also the jury was exposed to two days of testimony about the details of

Frizzell's crime scene and photographs of her dead body. These two days focused on Frizzell's killing tapped into every parent's worst nightmare of her young child leaving home and immediately encountering violence and death at the hands of a stranger.

We therefore conclude that the trial court's admission of the Frizzell evidence deprived Kipp of a fundamentally fair trial in violation of his due process rights.

## D.

On federal habeas review, we may grant relief for a federal constitutional error only if the petitioner can establish that the error resulted in "actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 2197–98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). "There must be more than a 'reasonable possibility' that the error was harmful." *Id.* at 2198 (quoting *Brecht*, 507 U.S. at 637).

We have little trouble in concluding that Kipp was prejudiced as to the first degree murder and attempted rape charges, as well as the special circumstance finding.[16] Kipp

---

[16] The dissent's suggestion that the Frizzell evidence prejudiced Kipp on the attempted rape charge and special circumstance finding but not the first degree murder charge is untenable. The prosecution asked the jury to find Kipp guilty of first degree murder on two theories— premeditated murder and felony murder. The verdict form did not distinguish between these two theories, and there is thus no way to know whether the jury relied on a premeditated murder theory in finding Kipp

was, effectively, on trial for the rape-murders of two young women but could only defend himself against one. This was underscored throughout the trial, from the prosecution's opening to closing statements. Without the Frizzell evidence, the prosecution's case was entirely circumstantial. At most, the prosecution could show that Kipp was the last person seen with Howard, that Kipp's fingerprints were found inside of Howard's car, and that, in speaking with the police, Kipp denied knowing Howard despite having spent the evening together. The prosecution moved to admit the Frizzell evidence precisely because it was "highly relevant on the issue of [Kipp]'s intent at the time of the killing of Antaya Howard." In other words, the prosecution needed the Frizzell evidence to show Kipp's intent to rape and intent to kill during attempted rape.

We are also not blind to the optics of the trial: Howard was a young African-American woman who was estranged from her family and was seen socializing with Kipp throughout the night of the crime; conversely, Frizzell was a young white woman, new to town, on the eve of beginning college, when she suddenly lost touch with her mother and was found dead. Los Angeles County separately prosecuted Kipp for the Frizzell murder. It appears significant to us that the prosecution here nonetheless relied so extensively on the

---

guilty. Regardless, the Frizzell evidence was critical under either theory. To find Kipp guilty of felony murder, the jury necessarily had to find Kipp guilty of attempted rape, a verdict the dissent implicitly acknowledges would have been affected by the Frizzell evidence. As to the premeditated murder theory, the prosecution's closing argument inexorably linked this theory to the attempted rape. Citing the Frizzell evidence, the prosecution argued that Kipp needed little time to premeditate the murder because he "had that experience before" when he murdered and raped Frizzell.

inflammatory details of the killing of a more conventionally "sympathetic" victim to prove its case for another victim.

Moreover, we find it compelling that the jury spent a few days in deliberations before returning a verdict. *See United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) ("Longer jury deliberations 'weigh against a finding of harmless error because lengthy deliberations suggest a difficult case.'" (quoting *United States v. Varoudakis*, 233 F.3d 113, 126 (1st Cir. 2000))). Defense counsel had argued at the motion in limine hearing that the Frizzell evidence "is so actually prejudicial, that the case will be all over for Mr. Kipp if it comes in [at trial]." Yet, even after hearing the Howard and Frizzell evidence over four days, the jury deliberated for three days before returning a verdict, indicating that Kipp's case was close. *See Thomas v. Chappell*, 678 F.3d 1086, 1103 (9th Cir. 2012) (noting that "the jury's assessment of the case strongly suggest[ed] that the case was close" where "[t]he jury deliberated for almost five full days, even though it heard argument and evidence for only about six days").

"Because of the lack of a 'weighty' case against [Kipp], and pervasiveness of the erroneously admitted evidence throughout the trial, we think it 'highly probable that the error had substantial and injurious effect or influence in determining the jury's verdict.'" *McKinney*, 993 F.2d at 1386 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We therefore reverse the district court's denial of habeas relief as to his convictions and the special circumstance finding.

## IV.

It is an axiomatic principle that a criminal charge must be proven beyond a reasonable doubt. *In re Winship*,

397 U.S. at 362. Relatedly, drawing propensity inferences from other acts evidence is impermissible under a historically grounded rule of Anglo-American jurisprudence. *See McKinney*, 993 F.2d at 1380, 1384; *see also Boyd v. United States*, 142 U.S. 450, 458 (1892) (finding that admission of prior crimes committed by defendants so prejudiced their trial as to require reversal). A defendant's right to due process is violated when courts admit other crimes evidence where there were no permissible inferences that could be drawn from the evidence, in other words, no inference other than conduct in conformity therewith. *See Garceau*, 275 F.3d at 774.

In order to have properly admitted the unadjudicated Frizzell crime evidence at the Howard trial, the state court was required to have found a "pattern and characteristics of the crimes [to] be so unusual and distinctive as to be like a signature." *Ewoldt*, 867 P.2d at 770 (quoting 1 McCormick on Evid. (4th ed. 1992) § 190, at 801–03). The state court reached that conclusion—but only after disregarding all the dissimilarities between the two crimes. Because the state court made a crucial factual error and failed to consider the entire state record, we conclude that its decision was based on an unreasonable determination of the facts and hold that Kipp's due process right to a fair trial was violated.

We therefore reverse the district court's denial of habeas relief as to the due process claim and remand with instructions to issue a conditional writ of habeas corpus.

**REVERSED** and **REMANDED with instructions.**

NGUYEN, Circuit Judge, dissenting:

A jury convicted petitioner Martin James Kipp of strangling to death nineteen-year-old Antaya Howard in the course of an attempted rape on December 30, 1983.  Kipp left Howard's body in her car, which was found abandoned in an alleyway in Huntington Beach, California.  He was the last person seen with Howard in the hours before her death, and his fingerprints were found on two windows and a beer can inside her car.  When confronted by the police, Kipp repeatedly lied about his whereabouts and denied ever meeting Howard or seeing her car.

At trial, the court admitted evidence that, just three months earlier, in the nearby city of Long Beach, California, Kipp had raped and strangled to death nineteen-year-old Tiffany Frizzell, leaving his fingerprints on a telephone in her motel room.[1]

The California Supreme Court carefully considered and rejected Kipp's challenge to the admission of the Frizzell evidence. *People v. Kipp*, 956 P.2d 1169 (Cal. 1998).  In a reasoned opinion, California's highest court cited to numerous similarities between the two murders and concluded that "the charged and uncharged offenses display a pattern so unusual and distinctive as to support an inference that the same person committed both." *Id.* at 1182.  The state court acknowledged the danger of prejudice to Kipp but concluded that "prejudice of this sort is inherent whenever other crimes evidence is admitted, and the risk of such

---

[1] A different jury later convicted him for the murder and rape of Frizzell.

prejudice was not unusually grave here." *Id.* at 1183 (internal citation omitted).

The Antiterrorism and Effective Death Penalty Act ("AEDPA") "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). The majority, however, circumvents AEDPA deference and concludes that the California Supreme Court made an "unreasonable determination of the facts" in "linking the two crimes and apparently fail[ing] to consider the entire record." Then, reviewing de novo, the majority reverses Kipp's convictions and death sentence. I respectfully dissent.

First, there is no support for the majority's assumption that the state court failed to consider material evidence favorable to the defense. To the contrary, the California Supreme Court summarized the very argument that the majority contends the state court ignored. *Kipp*, 956 P.2d at 1181. While reasonable jurists may disagree about the admissibility of the Frizzell evidence, under AEDPA's deferential review, we are simply not entitled to second-guess the decision of the California Supreme Court.

Second, even if the California Supreme Court's determination of the facts was unreasonable, the majority wrongly concludes that Kipp suffered actual prejudice. The evidence that Kipp murdered Howard was compelling, even setting aside the Frizzell evidence—Kipp was with Howard three hours or less before her death; his fingerprints were found in Howard's car, along with her body; his clothes from that night were soiled, and he carried a strong stench; he abruptly moved out of his friend's apartment where he had been staying prior to Howard's death; and in a recorded interview, he repeatedly lied to the police that he was in Oregon until December 31 (placing himself outside of

California on the date of Howard's murder), denied ever seeing, much less wearing, the sweater that he had borrowed the night of the murder, denied ever meeting Howard or seeing her car, and failed to explain the presence of his fingerprints in her car. In short, Kipp concocted an elaborate false narrative that distanced him from every detail that would have incriminated him.

## I.

## A.

Howard lived with her parents in Huntington Beach, California. The night before her murder, she left home after 10:00 p.m. and drove in her orange Datsun car to a local bar, the Bee Hive. Kipp sat next to Howard, and the two talked and drank together. They briefly left around 1:15 a.m. and returned later, but the bartender refused to serve them because it was nearing closing time. Kipp and Howard left again and went to Charlie's Chili in nearby Newport Beach. Around 4:00 a.m., they left Charlie's Chili together in Howard's car, with Kipp in the driver's seat. Howard was never seen alive again.

As of 6:00 a.m. that morning, Kipp still had not returned to his friend's apartment. Kipp's whereabouts were never accounted for.

At 7:00 a.m., Howard's car was spotted in an alley in Huntington Beach. Her body was found inside days later when a neighbor noticed a strong odor emitting from the car. She had been strangled to death, suffering a blunt force injury to the head and several bodily abrasions as well. Howard was mostly unclothed, with her blouse pulled back and her bra twisted above her breasts. Her jeans and panties

were around her ankles. Her clothes and torso were muddied as though her body had been moved.

At 4:30 p.m. on the day of her death, Kipp's friend came back to his apartment and found Kipp in the shower. The sweater Kipp had borrowed from his roommate and worn the night before was soiled and stained on the front and arms, and the room where Kipp slept had a strong and sour odor. Kipp immediately moved out of the apartment into a hotel room, where he stayed only one night.

Kipp's fingerprints were later found inside Howard's car on the left and right windows as well as on a beer can on the floor.

Kipp waived his *Miranda* rights and was interviewed at length by the investigating detectives. In that recorded interview, Kipp said he had been in Oregon and arrived in Southern California around December 31, thereby placing himself out-of-state when Howard was murdered. Kipp then detailed his movements in the days following his arrival but conspicuously left out any mention of the Bee Hive or the Charlie's Chili, locations where he had been seen with Howard. When shown a picture of Howard, Kipp denied ever meeting her. When shown a picture of Howard's car, Kipp said that he was absolutely positive that he had never seen it or been around it, and that he had no idea how his fingerprints ended up inside her car. Throughout the interview, Kipp repeatedly insisted that he does not know any black people in Huntington Beach, and that he is only interested in white girls. (Howard was African-American). Kipp denied ever seeing or wearing the sweater that his roommate said he had borrowed and worn the night of Howard's death. Kipp admitted that he had been to Charlie's Chili but said that he was last there in October or November with his girlfriend. When the detectives finally confronted

Kipp with the evidence against him, namely, his fingerprints in Howard's car and witnesses who saw them together, Kipp became nervous and upset. The detective who testified at trial described Kipp's reaction as follows: "Heavy breathing, [Kipp] looked away—look[ed] away from us, looked away from the table, very quick movements. His whole demeanor changed at that point. It changed so dramatically that I thought it important to get it documented."

## B.

Just three months before Howard's murder, Kipp had raped and killed another young woman named Tiffany Frizzell. Frizzell's body was found in a motel room in Long Beach, not far from the Huntington Beach area where Howard was killed. Kipp's fingerprints were found on a telephone in Frizzell's motel room. Like Howard, Frizzell was strangled to death. Like Howard, she also suffered bruising to her legs. Like Howard, she was killed in one location and then moved to another. Like Howard, her body was found in an enclosed area, covered by bedding. And like Howard, she was found with a garment on her upper body but an unclothed genital area, and her clothes were untorn.

## C.

Kipp challenged his convictions and death sentence on numerous grounds. In a careful, reasoned opinion, the California Supreme Court affirmed. As to Kipp's claim that the trial court erred in admitting the Frizzell evidence, the California Supreme Court began its analysis by summing up the prosecution's argument in favor of admission as well as Kipp's argument "that the [Frizzell] evidence had little or no relevance on the issues of identity and intent because the two killings were more dissimilar than similar." *Kipp*, 956 P.2d

at 1181. After reviewing the state evidentiary rule that applies, California Evidence Code section 1101(b), the Court focused its analysis on the "common features that revealed a highly distinctive pattern" between the two crimes, including the age and gender of the victims; the fact that the victims were killed in one location and then moved to another; the abandonment of each of their bodies in an enclosed location belonging to the victim; and the condition of the victims' bodies when they were found. *Id.* at 1181–82. The California Supreme Court then "conclude[d] that the trial court did not abuse its discretion when it ruled that the charged and uncharged offenses display a pattern so unusual and distinctive as to support an inference that the same person committed both." *Id.* at 1182. It further explained that "[a] lesser degree of similarity is required . . . on the issue of common design or plan . . . [or] the issue of intent," and that the common features of the two crimes readily met those burdens. *Id.*

The Court then discussed the trial court's weighing of the evidence's probative value versus the danger of undue prejudice to the defendant. *Id.* at 1182–83. It acknowledged a danger of prejudice to Kipp, but found that "prejudice of this sort is inherent whenever other crimes evidence is admitted, and the risk of such prejudice was not unusually grave here." *Id.* at 1183 (internal citation omitted). The Court emphasized that "[t]he Frizzell crimes were not significantly more inflammatory than the Howard crimes, the evidence that defendant committed both crimes was compelling, and the jury was correctly instructed on the purposes for which it might consider the evidence of the Frizzell crimes." *Id.*

## II.

## A.

The majority concludes that the California Supreme Court must have "ignored evidence that supported Kipp's claim that the Frizzell and Howard crimes were too dissimilar to support an inference of connection by common identity or intent," because the Court did not expressly discuss the differences between the two crimes. That's a grossly unfair reading of the state court decision.

The California Supreme Court had a straightforward task on this issue, that is, to evaluate whether the similarities outweighed the dissimilarities between the two crimes. Both sides presented arguments, which the Court explicitly acknowledged. Before analyzing the merits, the Court specifically summed up Kipp's position "that the evidence had little or no relevance on the issues of identity and intent because the two killings were more dissimilar than similar." *Kipp*, 956 P.2d at 1181. The Court then discussed the similarities between the crimes, explaining that "[i]n both instances, the perpetrator strangled a 19-year-old woman in one location, carried the victim's body to an enclosed area belonging to the victim (Howard to her car, Frizzell to her motel room), and covered the body with bedding (Howard with a blanket, Frizzell with a bedspread)." *Id.* The Court "note[d] also that the bodies of both victims were found with a garment on the upper body, while the breasts[2] and genital area were unclothed, that in neither instance had the victim's

---

[2] The state court did make one factual error in stating that Frizzell was found with her breasts exposed. This single detail does not defeat the state court's overarching conclusion about the parallels between the crimes.

clothing been torn, and that the bodies of both victims had been bruised on the legs." *Id.* at 1182. The Court concluded that, "[v]iewing the evidence in the light most favorable to the trial court's ruling, the charged and uncharged offenses displayed common features that revealed a highly distinctive pattern." *Id.* at 1181.

Particularly because the parties' competing arguments were straightforward and squarely presented, and given the numerous other challenges raised by Kipp that the state court had to address in a single opinion, I don't read much into the Court's choice to focus its written decision on the similarities between the crimes. There's no basis for concluding, as the majority does, that the state court simply "ignored" Kipp's reliance on the dissimilarities between the two crimes when Kipp's argument was explicitly acknowledged and considered.

The Supreme Court has repeatedly admonished our circuit that a state court decision is not "unreasonable" under AEDPA just because we would have reached a different outcome. *See Harrington v. Richter*, 562 U.S. 86, 101–02 (2011). At trial, the defense vigorously argued against admitting the Frizzell evidence. The trial court carefully weighed the evidence, noting that "it's a very close call" and a "tough question." The record shows that the California Supreme Court also weighed and considered the same defense arguments. Although "fairminded jurists could disagree on the correctness of the state court's decision," under AEDPA's "highly deferential" standard, the state court's decision must stand. *Id.* at 101, 105 (internal quotation marks and citations omitted).

## B.

Even if the state court made an unreasonable determination of the facts, Kipp was not actually prejudiced, at least as to his conviction for first degree murder.[3,4] The majority focuses on the circumstantial nature of the evidence against Kipp but completely discounts the strength of that evidence. Setting aside any reference to Frizzell, the prosecution's case was compelling that Kipp murdered Howard and did so with the requisite intent. As noted, Kipp and Howard were drinking together the night of Howard's death, and they left together in her car at most three hours before she was killed—Kipp was seen driving Howard away from Charlie's Chili restaurant at 4:00 a.m., and her car was seen abandoned just three hours later at 7:00 a.m. Kipp's fingerprints were found in multiple locations inside Howard's car.

Later that same afternoon, when Kipp returned to the apartment where he was lodging, he was found showering. His garments were soiled and stained, and his room carried a strong and sour odor. And he immediately moved out of the apartment.

---

[3] The evidence as to the attempted rape conviction and special circumstance finding is much weaker because apart from Howard's state of undress, there was no physical evidence of sexual intercourse on Howard's body due to decomposition.

[4] The majority suggests that the jury could have found Kipp guilty of first degree murder based solely on a theory of felony murder, which would entwine his murder conviction with the proof of rape. However, the evidence of premeditated murder far outweighed that of rape, and, on this record, it strains credulity to contend that a felony murder theory alone drove the jury's verdict on the murder charge.

Adding to his consciousness of guilt, Kipp repeatedly lied during an interview with the police: he denied ever knowing Howard despite having spent the night with her; he repeatedly insisted that he didn't know a single black person in Huntington Beach; he could not explain the presence of his fingerprints in Howard's car and denied ever seeing that car before; he placed himself in Oregon until the day after Howard was killed; he denied being at Charlie's Chili, except some months earlier with his girlfriend; and he denied borrowing his roommate's sweater and wearing it the night he met Howard. Kipp's demeanor changed dramatically when he was confronted with the inculpatory evidence against him, and he became nervous and upset, refusing to look at the detectives. This collection of evidence strongly supported Kipp's guilt, and there was no plausible alternative theory for Howard's killing.

The circumstances of the crime also strongly supported specific intent to kill. Howard died by strangulation with blunt force trauma to her head, and she had abrasions and bruises on her face and body. Howard's body was then abandoned in the back of her car, hidden from sight by a blanket. These facts clearly evince malice—again, setting aside any evidence from the Frizzell case.

In sum, because I cannot conclude that there is "more than a reasonable possibility" that any error was harmful, *Davis v. Ayala*, 576 U.S. 257, 268 (2015) (internal quotation marks and citation omitted), I would affirm Kipp's conviction for the first degree murder of Howard even if the majority were right to doubt the substance of the California Supreme Court's decision.

I therefore respectfully dissent.