**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RODNEY GENE BEELER,

*Petitioner-Appellant*,

v.

RONALD BROOMFIELD, Acting Warden, California State Prison at San Quentin,

*Respondent-Appellee*.

No. 20-99014

D.C. No. 2:96-cv-00606-GW

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted December 11, 2024
Pasadena, California

Filed January 23, 2026

Before: Johnnie B. Rawlinson, Jacqueline H. Nguyen, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Rodney Gene Beeler's habeas corpus petition challenging his California conviction and death sentence for first-degree murder.

Beeler raised three arguments concerning his competency to stand trial: (1) the trial court procedurally erred by not sua sponte holding a competency hearing; (2) he was incompetent to stand trial; and (3) defense counsel was ineffective in failing to raise his incompetency. Beeler also argued that, because he established a prima facie case, the California Supreme Court's summary denial of relief without issuing an order to show cause was unreasonable. Applying the highly deferential review required under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), the panel held that the California Supreme Court could have reasonably concluded the evidence does not sufficiently support Beeler's competency claims.

Beeler argued that his counsel provided ineffective assistance by failing to investigate and present evidence regarding his mental illness and organic brain damage at both the guilt and penalty phases. The panel held that, under

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

AEDPA review, the district court correctly denied Beeler's ineffective assistance of counsel claims.

- Beeler claimed that defense counsel should have used penalty phase mitigation and extra-record evidence of his mental illness and brain damage at the guilt phase to show that he did not form the specific intent to kill. The panel held that even assuming defense counsel performed deficiently in its investigation and presentation of evidence, Beeler was not prejudiced by counsel's decisions. And while Beeler was clearly not prejudiced, the California Supreme Court could also have determined that trial counsel acted reasonably and diligently during the guilt stage.

- Beeler claimed that the neurological evidence not presented at the penalty phase would have constituted additional mitigation, and there is a reasonable probability that one juror would have made a different decision based on that evidence. The panel held that the California Supreme Court could have reasonably determined that defense counsel's performance was not deficient, as counsel diligently sought neurological testing both before trial and after Beeler volunteered new information. Beeler failed to establish a prima facie case as to the ineffective assistance of counsel at the

penalty phase, and the California
Supreme Court's summary denial of this
claim was reasonable.

Beeler alleged that the trial court coerced the jury's death
verdict by failing to replace a juror with an alternate after the
juror informed the court of his father's sudden
death. Applying AEDPA review, the panel held that the
California Supreme Court neither erroneously applied
federal law nor made an unreasonable determination.

The panel rejected as foreclosed by *Karis v. Calderon*,
283 F.3d 1117 (9th Cir. 2002), Beeler's argument that
California fails to adequately narrow the pool of defendants
eligible for the death penalty.

---

## COUNSEL

Marta VanLandingham (argued) and John S. Crouchley,
Deputy Federal Public Defenders; Cuauhtemoc Ortega,
Federal Public Defender; Office of the Federal Public
Defender, Los Angeles, California; for Petitioner-Appellant.

Vincent P. LaPietra (argued), Lise S. Jacobson, and
Stephanie A. Mitchell, Deputy Attorneys General; Holly D.
Wilkens, Supervising Deputy Attorney General; James W.
Bilderback II, Senior Assistant Attorney General; Rob
Bonta, California Attorney General; Office of the California
Attorney General, San Diego, California; for Respondent-
Appellee.

Susan Garvey and Natalie Link, Habeas Corpus Resource
Center, San Francisco, California, for Amicus Curiae
Habeas Corpus Resource Center.

Jessica E. Oats, Senior Deputy State Public Defender; Mary K. McComb, State Public Defender; Office of The State Public Defender, Sacramento, California; for Amicus Curiae Office of The State Public Defender.

**OPINION**

NGUYEN, Circuit Judge:

A jury sentenced Rodney Gene Beeler to death following his conviction for the first-degree murder of Anthony "Tony" Joseph Stevenson during a daytime robbery in December 1985. Beeler appeals the district court's denial of his petition for writ of habeas corpus. We affirm.

## I. BACKGROUND[1]

### A. The Guilt Phase

Tony Stevenson lived with his two brothers, Michael and Dino, in a house in Orange, California. On the morning of December 30, 1985, all three brothers left for work. But just before 11:00 a.m., the Stevensons' neighbor discovered Tony lying on the front lawn of the neighbor's house, shot in the back. Police and paramedics arrived after the neighbor called 911, but Tony died at the scene.

The rear, sliding-glass door of Tony's house had been pried open with a screwdriver, and the house had been ransacked. Bullets for Tony's .22-caliber semi-automatic rifle were strewn across his bed. The rifle was found on a

---

[1] These facts are largely taken from the California Supreme court's opinion in Beeler's direct appeal, *People v. Beeler*, 9 Cal. 4th 953 (1995).

hallway floor, its wooden parts badly damaged. One of the bedroom doors had a large gash that police attributed to the butt of the rifle. Jewelry, a camera and lens, $1,200 in cash, a dark blue gym bag, Dino's fake Rolex watch, and Michael's .22-caliber single-action Ruger revolver, which he kept unloaded under his bed with two bullets nearby, were taken from the house. Michael's gun was never recovered.

An autopsy revealed Tony died from a single .22 caliber bullet that entered his back and pierced his lung and heart. The muzzle of the gun had been more than two feet away from Tony when he was shot. A ballistics expert determined the bullet that killed Tony was not fired from the broken rifle found inside the house but could have been fired from Michael's missing revolver. Another .22 caliber bullet was found lodged in a car parked across the street from the Stevensons' house. But the recovered bullet was too damaged to determine whether it had been fired from either weapon.

A small bullet hole in the screen door aligned with the bullet hole in the car across the street, suggesting a gun was shot through the screen door. Relying on the evidence of forced entry, ransacking, and a violent struggle inside the Stevensons' house, the prosecution theorized that Tony had returned home during a burglary and confronted the perpetrator, but as he fled the house, the perpetrator shot him in the back with Michael's gun.

Beeler, whose identity as the burglar is not at issue in this appeal, was linked to the crime by fingerprint evidence and the testimony of three neighbors. In one of the bedrooms, Beeler's fingerprint was found on top of a file cabinet. Floyd Raney, a neighbor living down the street from the Stevensons, testified that he was in his garage around the

time of the killing with the door open.  Raney heard a motor running outside and saw a pickup truck parked directly across the street.  Beeler approached Raney in his garage in what Raney described as pale blue jeans and a solid blue shirt.  Beeler asked Raney, "My cat jumped the wall in your backyard.  Would you look back there, please, and see if my cat is back there?"  When Raney returned from checking the backyard, he saw Beeler taking off in the pickup truck.  About fifteen minutes later, the police arrived in response to the discovery of Tony's body.  At trial, Raney identified a picture of Beeler's truck as being similar to the one he saw the day of the murder.

Lavada Hoskins lived on the street running parallel to the Stevensons' street.  A block wall ran between the backyards of the houses on Hoskins's street and the Stevensons' street, including Raney's yard.  The morning of the killing, Hoskins was in her backyard talking to her neighbor, Fern Awalt, when both women saw a man walking along the top of the block wall between 10:30 a.m. and 11:30 a.m.  Neither Hoskins nor Awalt saw the man's face, but Hoskins recalled him wearing a blue plaid shirt and carrying a small, dark sports bag.  Awalt remembered the man wearing work pants and a solid blue shirt.  Neither woman saw any other unknown person in the neighborhood around the time of the killing.

The prosecution also offered testimony of Beeler's coworkers to link him to the crime.  At the time of the killing, Beeler worked as a senior line operator at a laminated products company.  Jim Anderson, who reported to Beeler, testified that Beeler had left work early, at about 10 a.m., on the day of the killing.  Calvin Brunsting, the company's manager, testified that Beeler's timecard for December 30, 1985, showed him clocking in at 5:45 a.m.  But sometime

after December 30, Beeler had asked him to write in that Beeler had left at 3:40 p.m., explaining that he had forgotten to clock out.

John Lorenzi, another coworker, testified that sometime between Christmas and New Year's Eve, Beeler had said to him, "John, let me ask you a hypothetical question. If I was—if you were robbing somebody's house, someone who lived there caught you in the act, would you shoot him?" Lorenzi replied, "Why? Did you kill somebody?" Lorenzi testified that Beeler became upset and responded, "No, asshole." Beeler posed a similar question to Anderson, asking "Hypothetically speaking, if you were robbing a house and the guy came home—the guy that lived there, this is, came home and you had a gun, would you shoot him?" Anderson said, "No, I wouldn't. I wouldn't put myself in that position to begin with. Why, did you do something, did you kill somebody?" Beeler said no and walked away.

Sometime after January 1, 1986, Beeler offered Anderson the stolen watch for $500. On January 7, 1986, Beeler sold an Italian gold charm taken from the Stevensons. Police eventually searched Beeler's locker at work and found the stolen camera and lens.

The defense offered two alternative theories to counter the intent-to-kill requirement of the felony-murder special circumstance. The primary theory was that Beeler's work supervisor, Mitchell Jackley, participated in the burglary and was the actual killer. Jackley testified for the prosecution at Beeler's preliminary hearing under a grant of immunity for receiving stolen property from Beeler. But the defense called him as a witness at trial in an attempt to undermine his credibility.

The defense argued that Jackley knew details about the crime that suggested he was the shooter. Jackley testified that he had breakfast with Beeler the day of the killing and authorized Beeler to leave work early. Beeler told Jackley later that day that he had broken into the Stevensons' house and killed Tony. Jackley also testified that he stole the key to Beeler's locker and found the camera, handling it with silk gloves so as not to leave fingerprints.

On January 9, 1986, Jackley called the police to implicate Beeler for killing Tony. Jackley testified that he reported Beeler anonymously because he feared being connected to the crime for two reasons. First, Jackley said he had been inside the Stevensons' house before the killing because his wife was acquainted with Dino, so he feared his fingerprints might show up. Second, Jackley testified that he had previously been charged with murder. Additionally, Jackley had received stolen belongings from Beeler from a prior robbery.

Jackley provided the following account of the crime to police investigators:

> The way [Beeler] explained it to me is that while he was in the house, that is, ah, ah, Tony apparently's his name, came in and brought his—brought his dog in? Ya. Called his dog. His dog was with him. [Beeler] was saying his dog was with him and he thought he was calling some friends or somethin' and then—what the fuck else did he say?—he said right after that took place, [Beeler] apparently was in one of the bedrooms, he said or somethin', and went behind the corner or somethin' like that . . . . And the guy

> [Tony] went into his room.  He [Beeler] told
> me he [Tony] came out with a goddamn ah
> rifle and told him he was gonna beat the shit
> out of him with it, and he's gonna to do [*sic*]
> bodily damage . . . .  And he [Beeler] said
> somethin' to the effect that they got into an
> altercation in the hallway, and that the guy
> came at him with a rifle, used it like a
> club—.

Jackley provided other details of the crime.  For instance, Beeler told him he "hit" two rooms in the Stevensons' house and was in the third when Tony unexpectedly returned home. Beeler took a .22-calliber revolver from the house and shot Tony in the back with a hollow-point bullet as Tony ran away from the house.  Beeler told Jackley that Tony fell on the front lawn and that Beeler escaped "down a brick wall running on the back of" the Stevensons' house.  Beeler said he had left his truck idling and had a conversation with a person outside the house at the end of the wall.

The defense attacked Jackley's credibility with the fact that he had been charged with a similar crime years earlier, but those charges were dropped once Jackley agreed to testify for the prosecution.  Jackley and his accomplices were arrested in 1974 in connection with a robbery-murder in South Carolina.  Jackley admitted to the burglary but denied any involvement with the killing.  Jackley provided a similar story in that case, alleging that one of his acquaintances confessed the killing to Jackley, an anonymous call was made to the police implicating that defendant, Jackley had received stolen goods from the defendant, and Jackley knew many of the details of the crime.  And, similar to this case,

the charges against Jackley were dropped once he testified for the prosecution.

Jackley also admitted to three other burglaries in which he knew the victims, the items taken were similar to those stolen from the Stevensons' house, and his fingerprints were not found at any of the crime scenes. The defense argued that all the similarities to the instant case pointed to Jackley as the killer and principal burglar, not Beeler.

The second theory the defense offered assumed that Beeler was the shooter but that the evidence of the bullet's trajectory was consistent with "at least two reasonable interpretations." One was the prosecutor's theory; the other was that during the struggle inside the house, Tony used the rifle to fire a shot "down the hall" that hit the car outside, and Beeler fell and shot Tony as Tony was standing over him. The prosecution's expert conceded on cross-examination that the evidence of the bullet's trajectory was compatible with this defense theory.

After a seven-day guilt-phase trial and less than a half day of deliberations, the jury found Beeler guilty of first-degree murder and burglary. The jury also found Beeler personally used a handgun during the commission of the offense and the felony-murder special circumstance to be true, making Beeler eligible for the death penalty.

## B. The Penalty Phase

### 1. Prosecution's Case in Aggravation

During the penalty phase, the prosecution presented evidence of Beeler's three prior burglaries and one prior rape. The parties stipulated that Beeler had convictions for second-degree burglary in 1971, first-degree burglary in 1974, and second-degree burglary in 1976. He was

committed to the California Youth Authority for the first burglary and sentenced to state prison for the subsequent convictions.

In 1985, Beeler raped Roxanne Doyle as she was delivering newspapers. She testified that he told her a false story about his truck breaking down as an excuse to accompany her along her route. After Doyle completed her deliveries, Beeler hit her in the face, forced her to the ground, and orally and vaginally raped her while threatening her with a knife.

Beeler then forced Doyle to give him her wedding and engagement rings. She begged to keep her rings because she had recently gotten married, but he threatened, "Give me your rings or I'll cut your finger off." He also laughed when he discovered that he had broken her eyeglasses. Beeler's coworker testified that when Beeler arrived at work that morning, he bragged that he had robbed and "fucked the shit out of" a "good looking" woman with a "nice figure" and "big tits."

## 2.  The Defense's Case in Mitigation

The defense presented a substantial mitigation case, featuring five mental health experts and several lay witnesses from Beeler's personal life.[2] The mitigation evidence focused on the physical and sexual abuse Beeler suffered as a child and his long-term mental impairments. The defense also offered evidence of his positive qualities as

---

[2] A total of five mental health expert witnesses testified on Beeler's behalf. At counsel's request, the trial court appointed two additional psychologists, Drs. Jay Adams and Francis Crinella, to evaluate Beeler, but they did not testify.

a father and his successful adjustment to the structured setting of incarceration.

Beeler's mother, Lillian Morris, testified that Beeler had been a normal child growing up, even though Beeler's father was known to beat him and his brother, Tom.  This abuse involved beating the boys with a piece of automative rubber when Beeler was as young as six years old.  Nonetheless, it was not until she and Beeler's father separated in 1960—when Beeler was about ten years old—that Beeler began to show behavioral issues.  After the separation, Beeler and his brother were forced to live with their father and stepmother Lorna Jenkins, who treated Beeler cruelly.

The jury heard from several lay and expert witnesses about Jenkins' abuse of Beeler.  Beeler's mother said that Jenkins prevented Beeler from having contact with or receiving presents from his mother.  Beeler's stepsister, Rebecca Mullins, testified that Jenkins was "a very violent person" who abused Beeler and her other children.  Jenkins would burn Beeler's hands with a lighter, lock him in the closet from 30 minutes to several hours, force him to eat fruit preserves until he vomited, and beat him with a belt buckle hard enough to draw blood and leave welts.

Several neighbors also testified to Jenkins' abuse of Beeler.  Byron and Barbara Fellows testified that on one occasion Jenkins punished Beeler for smoking by forcing him to smoke unfiltered cigarettes until he burned his lips and fingers.  On another occasion, Beeler was outside at 4:00 a.m. after being locked in the closet all night.  The neighbors later reported Jenkins to the police when Beeler's brother came to their house with injuries to his body from being beaten with an electrical cord.  Jolene Higley testified that she was "raised with [Beeler] like a sister" and witnessed the

severe abuse inflicted on Beeler by his stepmother, who regularly referred to him as "a little bastard." The abuse included being locked in a small closet for hours, chained to a basement post, thrown down a flight of stairs with his hands tied behind his back, beaten with a belt buckle and brush, and forced to hold his hands over a flame. Moreover, Beeler once touched Higley "in the breast and vagina area," and said, "It's okay, Mom showed me this."

Dr. Lenore Walker, a clinical and forensic psychologist, provided some of the most disturbing testimony regarding Jenkins. Dr. Walker testified that she and her associate, Lon Kopit, another psychologist, spent 29.5 hours over the course of fourteen sessions interviewing Beeler and administering cognitive and personality tests. In addition to the other abuse already described, Dr. Walker deemed credible Beeler's accounts of Jenkins smearing fecal matter on his face as punishment for soiling himself and the sexual abuse she inflicted when Beeler was between the ages of ten and twelve. She would tie his penis back with a string and make him wear dresses because she wanted him to look like a girl. Later, she began inserting her soiled tampons into his anus and forcing him to masturbate and orally copulate her. She would also masturbate him and painfully squeeze his testicles to prevent him from reaching an orgasm, or "take the semen and smear it all over his face" as punishment. This abuse progressed to vaginal intercourse during which Beeler was not allowed to reach an orgasm.

In 1964, there was a juvenile proceeding due to the reported abuse. Dr. Robbert Lippold, a former clinical psychologist who had assessed Jenkins characterized her as a "potentially explosive" and "character-disordered individual who . . . was fully capable of operating in a very bizarre and very disturbed manner," including sexually.

Jenkins admitted to Dr. Lippold that she had beat Beeler and his brother but appeared to be "more concerned about being caught than the action itself." Even though "deprivation of custody cases were relatively rare at that point in time," Dr. Lippold recommended to the court that "the children be taken away from her."

Beeler was removed from Jenkins' home and thereafter spent time in foster homes, mental hospitals, youth camps, the military, and prison. Cleo Christensen's family was one of Beeler's foster homes. Christensen testified that he caught Beeler molesting his four-year-old son in a corn field. At the caseworker's direction, Christensen took Beeler back to his stepmother, even though he was reluctant to do so because he knew that Beeler previously had been "tied up to a pole and beaten by her." In 1966, Beeler was committed to a mental hospital. Upon his release, Beeler temporarily moved in with his mother, but she did not receive any refills for his medication or other information regarding his mental health issues. John Cahill, a camp counselor while Beeler was incarcerated at Spring Mountain Youth Camp as a 15-year-old, testified that Beeler was "a pitiful character" who "tended to be easily manipulated and generally picked on." Another camp counselor, Marlin Robinson, said Beeler did not engage in violent or aggressive behavior but would steal "small inconsequential items."

Dr. Noble testified to his examination of Beeler in 1971, while he worked for the California Department of Corrections. Dr. Noble opined that Jenkins was "extremely vicious" to Beeler, priming him from an early age to view his life as a cycle of misbehavior and punishment. He believed that Beeler's prior burglaries were "almost routine, automatic kind of behaviors" and a subconscious cry for help because "he had virtually no insight" into his "psychiatric

problems." Dr. Noble had recommended psychotherapy for Beeler, but the prison only provided him with medication used to treat manic depression.

According to Dr. Walker, Beeler's past abuse caused him to experience various forms of gender confusion and engage in sexual misconduct and compulsive theft. Beeler also had learning disorders, and suffered from feelings of guilt, a need to be punished, and dissociative symptoms, which manifested in him "often wak[ing] up in the middle of a burglary" without "know[ing] how he got there or . . . what he was doing." She believed that his tendency to steal was not motivated by greed, but by a compulsion he could not control. In her opinion, Beeler exhibited "a very inconsistent, unusual kind of diagnostic pattern" that was consistent with—but went beyond—post-traumatic stress and dissociative disorders. At times, "his mind [was] so interfered with that . . . he would look like a schizophrenic" or "profoundly emotionally disturbed," but "there [we]re other times when he d[id] not appear to be that way." Particularly during bouts of significant stress, Beeler would become "psychotic" and "not know the difference between . . . what is real and what is in his head." Dr. Walker noted that Beeler had consistently "plead[ed]" for counseling and psychotherapy, but the institutional systems had offered only medication, including the antipsychotic medication Stelazine, and had not provided "the kind of help that would have made a difference for him."

Similarly, Dr. Stephen Wells, a clinical psychologist, found that Jenkins' prolonged and severe abuse "was almost an impossible group of experiences [for Beeler] to recover from." Dr. Wells generally agreed with Dr. Walker regarding Beeler's severe emotional problems, including "occasional psychotic episodes" and bouts of dissociation

during which "he did things without being aware of what he was doing."

Dr. Walker, Dr. Noble, and Dr. Wells all testified that Beeler had adjusted well to an institutionalized setting. For instance, Beeler had volunteered to help the prison laundry and chapel during an inmate strike. And Dr. Wells determined that Beeler would not pose a danger to guards or inmates if he were to serve a sentence of life without the possibility of parole.

Beeler has two children, who were minors at the time of the trial. Beeler's wife, Kathleen Beeler, and his welding instructor, Lee Saylor, both testified that Beeler was a loving father to his two children and that he never abused them. Dr. John Selden, another clinical psychologist, testified that he had been treating Beeler and his five-year-old son for behavioral issues around the time of the murder. Dr. Selden learned that the family was under great stress due to medical and financial problems and that Beeler was very concerned about his family's welfare and not repeating the abuse he himself had suffered as a child. He also testified that Beeler's son seemed very attached to him.

### 3. Closing Arguments, Verdict, and Sentencing

On July 12, 1988, after deliberating for one full day and brief portions of two others, the jury reached its death verdict. At defense counsel's request, the sentencing hearing was continued to November 4. On November 4, defense counsel successfully moved for a second continuance, asserting, among other things, the need to investigate a previously unreported head injury, which Beeler had only recently realized was potentially significant.

On December 16, the trial court held a hearing on Beeler's motion, brought pursuant to *People v. Marsden*, 465 P.2d 44, 49 (Cal. 1970) (in bank), seeking to discharge and substitute counsel.  At the hearing, Beeler stated that he wanted to undergo an electroencephalogram ("EEG") and a computed axial tomography ("CAT") scan, imploring, "I feel there is something wrong."  Defense counsel explained that, during the time granted by the previous continuance, they had deemed such tests unnecessary after investigating and consulting with two doctors about the possibility of organic brain damage based on Beeler's self-reported blackouts from several years ago.  But defense counsel stated that Beeler "has today informed us, for the first time, that these blackouts, such as the two or three that we were previously aware of, continue and [occur] perhaps even on a daily basis now."  Beeler said at the hearing that the new blackouts, which he had not reported to the jail medical staff, "last for a few minutes but I'm having them so often that hours go by that I don't even remember what's going on." The trial court denied the *Marsden* motion but granted counsel's motion for a third continuance.

On January 27, 1989, the trial court again granted a fourth continuance for counsel to "obtain[] . . . additional expert information based on tests yet to be completed."  On March 24, counsel obtained a fifth continuance to allow psychiatrist Dr. Monte Buchsbaum time to complete analysis and calculations on recent positron emission topography ("PET") scan results of Beeler's brain, after which a forensic neurologist would review Dr. Buchsbaum's findings and conclusions.

While the trial court had previously warned against further delays, defense counsel requested a sixth continuance at the next hearing on May 5.  As support, defense counsel

filed their own declaration, stating that preliminary interpretations from the neurological testing indicated "significant evidence of dysfunction in the right temporal and bilateral frontal lobes of Mr. Beeler's brain." Counsel explained that while this evidence was potentially relevant to the guilt phase issue of intent and the penalty phase issue of mitigation, there was no further information available because "the people who gave the test . . . aren't really qualified to interpret the data," and a qualified expert had just agreed to conduct the analysis. The trial court denied the continuance motion, expressing doubt that any expert could provide new insights into Beeler's mental status. The trial court also emphasized that defense counsel "ha[d] done a diligent effort in pursuing everything that [they saw] fit," and the failure to find a new expert was not due to delay or incompetence.

At that same hearing, the trial court denied the defense's motion for a new trial based on insufficient evidence of intent to kill and Beeler's alleged organic brain damage. The trial court further denied the defense motion to modify the death verdict after reweighing the aggravating and mitigating circumstances.

### 4.  Post-Trial Proceedings

On automatic direct appeal, the California Supreme Court affirmed Beeler's conviction and sentence in a reasoned opinion, issued on April 10, 1995. *See Beeler*, 9 Cal. 4th 953. The U.S. Supreme Court denied certiorari.

Beeler filed his first state habeas petition while his appeal was pending. As relevant here, he claimed that trial counsel was prejudicially ineffective for failing to present evidence of his diagnoses of organic brain damage, possible seizure disorder and multiple personality disorder in the guilt

and penalty phases of his trial and for failing to provide competent evidence of his organic brain damage before sentencing. In November 1995, the California Supreme Court denied the petition on the merits as well as some of the claims on procedural grounds.

Beeler filed a second state habeas petition in 1997, arguing that he had been incompetent to stand trial, the trial court violated his rights by failing to sua sponte hold a competency hearing, and trial counsel rendered prejudicially ineffective assistance for failing to declare a doubt as to his competency. Beeler also asked the California Supreme Court to reconsider his prior ineffective assistance of counsel claim. In 2004, the state court denied the petition on the merits, except for Beeler's claim that he was incompetent to be executed, which it denied as premature. The court also ruled that certain claims and/or subclaims were procedurally barred, including Beeler's claim that the trial court erred by failing to conduct competency proceedings.

Beeler filed a first amended federal habeas petition on February 11, 2005, and the district court granted the State's motion to dismiss an unexhausted claim. On September 9, 2009, Beeler filed an amended petition without the unexhausted claim. On December 2, 2020, the district court entered judgment denying the amended petition and issued a certificate of appealability on claims K (incompetency claim) and L (ineffective assistance of counsel at guilt and penalty phases) of the amended petition. Beeler timely appealed.

## II. STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 2253, and we review de novo a district court's denial of habeas relief. *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019).

Because Beeler filed his federal habeas petition after April 24, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. *Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014). Under AEDPA, habeas relief is barred unless the state court's denial of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

Review under § 2254(d) applies to the last reasoned state court decision. *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). This court "confine[s its] § 2254(d)(1) analysis to the state court's *actual* decisions and analysis," as opposed to "some *hypothetical* alternative rationale." *Frantz v. Hazey*, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). However, where there is no reasoned state court decision addressing a claim, we conduct the AEDPA analysis by "consider[ing] what arguments or theories could have supported the state court's summary denial." *Montiel v. Chappell*, 43 F.4th 942, 958 (9th Cir. 2022) (citing *Harrington v. Richter*, 562 U.S. 86, 96, 102 (2011)), *cert. denied*, 143 S. Ct. 1785 (2023).

When determining whether the state court violated § 2254(d), we look to California's procedures for handling habeas petitions, which require the state court to issue an order to show cause when the petitioner makes out a prima facie case for relief on a claim. *See Cullen v. Pinholster*, 563 U.S. 170, 188 n.12 (2011); *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995) (in bank). "If no prima facie case for relief is stated, the court will summarily deny the petition." *Duvall*, 886 P.2d at 1258. The California Supreme Court

finds a prima facie case for relief when, "'assuming the petition's factual allegations are true, the petitioner would be entitled to relief.'" *In re Figueroa*, 412 P.3d 356, 364 (Cal. 2018) (quoting *Duvall*, 886 P.2d at 1258); *but see Pinholster*, 563 U.S. at 188 n.12 (noting that "wholly conclusory allegations" do not state a prima facie case for relief under California law). As a result, while the California Supreme Court's summary denial in this context "is a decision on the merits and thus entitled to AEDPA deference," *Ochoa v. Davis*, 50 F.4th 865, 888 (9th Cir. 2022), *cert. denied sub nom Ochoa v. Smith*, 144 S. Ct. 381 (2023), such a denial "necessarily assume[s] the truth of [the petitioner's] factual allegations," *Michaels v. Davis*, 51 F.4th 904, 940 n.17 (9th Cir. 2022).

We treat Beeler's opening brief, which addresses two uncertified issues, as an application to expand the certificate of appealability, *see* Fed. R. App. P. 22(b)(2) and Ninth Cir. R. 22-1(e), and we grant the application as to both.

## III. DISCUSSION

### A. Competency Claim

Beeler raises three arguments concerning his competency to stand trial: (1) the trial court procedurally erred by not sua sponte holding a competency hearing; (2) he was incompetent to stand trial; and (3) defense counsel was ineffective in failing to raise his incompetency. Beeler also argues that, because he established a prima facie case, the California Supreme Court's summary denial of relief without issuing an order to show cause was unreasonable. Applying the "highly deferential" AEDPA review, *Clark v. Arnold*, 769 F.3d 711, 724 (9th Cir. 2014), we are compelled to find that the California Supreme Court could have reasonably concluded the evidence does not sufficiently

support Beeler's competency claims, *see Montiel*, 43 F.4th at 958; 28 U.S.C. § 2254(d)(2).

**1.**

"[T]he criminal trial of an incompetent defendant violates due process." *Medina v. California*, 505 U.S. 437, 453 (1992). Competency requires "the capacity to understand the nature and object of the proceedings . . . , to consult with counsel, and to assist in preparing [one's] defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). "Competency disputes can give rise to two distinct claims—substantive and procedural—that trigger different analyses under the general heading of due process." *Lounsbury v. Thompson*, 374 F.3d 785, 788 (9th Cir. 2004).

As to procedural competency, the trial court must sua sponte conduct a hearing to determine a defendant's competency if "the evidence before [it] raises a 'bona fide doubt' as to a defendant's competence." *Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010) (quoting *Pate v. Robinson*, 383 U.S. 375, 385 (1966)); *see also People v. Rogers*, 141 P.3d 135, 152 (Cal. 2006) (noting that California Penal Code § 1368 similarly provides that the trial court must "suspend trial proceedings and conduct a competency hearing whenever the court is presented with . . . evidence that raises a reasonable or bona fide doubt concerning the defendant's competence"). A bona fide doubt exists when "a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011) (internal quotation marks omitted). Under this standard, the trial court must have been presented with substantial

evidence of incompetence.  *Williams v. Woodford*, 384 F.3d 567, 604 (9th Cir. 2004).

While the court's "responsibility [to conduct competency assessment] continues throughout trial," *Maxwell*, 606 F.3d at 568, there is no "general standard with respect to the nature or quantum of evidence necessary" to trigger a hearing, *Drope*, 420 U.S. at 172.  Instead, "the trial judge must evaluate all the evidence and evaluate the probative value of each piece of evidence in light of the others." *Chavez v. United States*, 656 F.2d 512, 518 (9th Cir. 1981).  Relevant "evidence includes the defendant's demeanor before the trial judge, irrational behavior of the defendant, and available medical evaluations of the defendant's competence to stand trial." *Williams*, 384 F.3d at 604 (citing *Drope*, 420 U.S. at 180).  The evidence may include the observations of trial counsel, *Medina*, 505 U.S. at 450, but counsel's opinion "certainly is not determinative," *Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1991); *see also Michaels*, 51 F.4th at 943 (explaining that, "[g]iven the generality and flexibility of the competency inquiry," state courts have even more leeway under AEDPA in reaching a reasonable decision).

Beeler points to three categories of evidence to support his claim.**[3]**  He first points to significant trial testimony recounting his childhood, institutionalizations, and mental health issues, which included schizophrenia, manic depression, and dissociation.  He next points to post-verdict

---

[3] Beeler never states when exactly the trial court should have ordered a competency hearing.  Nonetheless, "[t]he competency right does not end at a conviction, but rather persists through sentencing," *United States v. Dreyer*, 705 F.3d 951, 961 (9th Cir. 2013) (cleaned up), so the totality of the circumstances will be considered.

evidence of his self-reported blackouts and counsel's assertion that the uninterpreted raw testing data showed "significant evidence of [neurological] dysfunction." And lastly, Beeler relies on juror declarations stating that, during the trial, Beeler "seldom talked to his attorneys," "did not show any emotion," "looked very strange," and "just [sat] like a lump."

The evidence of Beeler's mental health and blackouts does not raise a bona fide doubt as to his competency because none of it demonstrates "a causal connection between the mental disease or defect and his inability to understand the proceedings." *United States v. Neal*, 776 F.3d 645, 656 (9th Cir. 2015); *see also United States v. Garza*, 751 F.3d 1130, 1136 (9th Cir. 2014) ("Even a mentally deranged defendant is out of luck if there is no indication that he failed to understand or assist in his criminal proceedings."). Trial counsel and expert witnesses never raised an argument regarding his competency to stand trial but instead focused on connecting Beeler's mental health to the issues of his guilt and penalty. In fact, Dr. Walker specifically testified that Beeler was aware of the charges against him, understood the purpose of psychological tests, and shared his views on his wife's potential as a witness. *See Davis v. Woodford*, 384 F.3d 628, 647 (9th Cir. 2004) (rejecting competency claim in part because the expert "gave no indication that he thought [petitioner] was not competent").

Nor does Beeler allege that he displayed any irregular behavior in or out of the courtroom. *See Williams*, 384 F.3d at 605 (deeming it relevant that petitioner did not "evidence any bizarre or irrational behavior"). He cites to juror declarations that describe his passivity at the counsel table, but such evidence on its own neither proves nor disproves

competency.  *See, e.g.*, *Odle v. Woodford*, 238 F.3d 1084, 1088–89 (9th Cir. 2001).  Moreover, the trial court had more information as to Beeler's capabilities than the jury.  For example, the trial court was informed that Beeler had significantly participated in the preparation of a lengthy mitigation document.  And at sentencing, the trial court observed Beeler coherently explain the reasons for his *Marsden* motion.  Because the evidence at trial was insufficient to raise doubt as to his competency, we cannot conclude that the California Supreme Court acted unreasonably in denying this claim.  *See* 28 U.S.C. § 2254(d)(2).

**2.**

Beeler next raises a substantive due process argument based on his claim that he was incompetent to stand trial. *See Williams*, 384 F.3d at 608.  In comparison to procedural competency, substantive competency involves both an easier and a more difficult standard.  It involves an easier standard because, unlike procedural competency, review of substantive competency is not limited to the "facts and evidence that were" at "the state trial court before and during trial." *Williams*, 384 F.3d at 608.  It involves a more difficult standard, however, because the petitioner must show actual incompetence at the time of trial.  *Id*.  In assessing actual incompetence, the court "disfavor[s] retrospective determinations of incompetence, and give[s] considerable weight to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial." *Id.*  Moreover, while "not a trained mental health professional," *Odle*, 238 F.3d at 1088–89, the fact that counsel did not move for a competency hearing is "especially relevant," *Williams*, 384 F.3d at 608; *see* Cal. Penal Code § 1368 (providing that either counsel or the trial court may move for a competency

hearing); *Medina*, 505 U.S. at 450 (noting that "defense counsel will often have the best-informed view of the defendant's ability to participate in [the] defense").

Because, as discussed above, the evidence during trial was not enough to raise a bona fide doubt of competency, Beeler's success on the substantive competency claim necessarily hinges on evidence that was not available to the trial court. *See Williams*, 384 F.3d at 608. On appeal, Beeler points to five pieces of additional evidence. First, in a declaration filed alongside Beeler's first state habeas petition, Dr. Walker stated that she "advised Beeler's counsel that Beeler's blackouts and mental condition may have a neurological basis, and . . . that counsel [should] retain a neurologist and neuropsychologist." Second, Dr. Wells also provided a declaration, in which he declared that he had "recommended to [counsel] that Beeler undergo a highly sophisticated mental health evaluation to alleviate" his self-reported "auditory and visual hallucinations." Third, a declaration from Dr. Monte Buchsbaum—the doctor who evaluated Beeler's post-verdict EEG and PET scans— confirmed counsel's representation to the trial court that Beeler's scans showed brain abnormalities consistent with head injury. Dr. Buchsbaum declared that Beeler's results were "among the most abnormal" he had seen and were "similar to those often found in people diagnosed as schizophrenics." Fourth, jail records showed that before and during trial, Beeler was on suicide watch, reported hearing voices, suffered head injuries, pulled out his toenails, was prescribed antidepressant and antipsychotic medications, and experienced chest pains. Fifth, declarations from three fellow inmates stated that Beeler appeared to be mentally impaired, "understood very little of what went on at his trial," "would not have been able to assist his attorneys,"

"did not seem to understand the difference between his lawyers and people who were potentially hostile to his defense," and "had memory lapses that covered long periods of time."

As with the procedural incompetency claim, the new evidence of declarations from the medical professionals and the jail records do not causally connect Beeler's mental health problems with his competency to stand trial. *See Neal*, 776 F.3d at 656; *Garza*, 751 F.3d at 1136. For instance, the jail records reflect that Beeler attributed his self-harm that resulted in his placement on suicide watch "to racial unrest on his floor and fear for his physical safety." *See also Dennis ex rel. Butko v. Budge*, 378 F.3d 880, 892 (9th Cir. 2004) ("[E]vidence of suicidal ideation or attempts to commit suicide in the past is insufficient to demonstrate incompetency."). Medical reports from the jail reflected that Beeler pulled out his toenails as a result of his stress about going to court and as a means of manipulation. Further, the reports noted that the antidepressant medications had helped with his behavior and mood. As a result, instead of being indicative of an inability to understand the proceedings or participate in his defense, the mental health issues experienced by Beeler in jail appear to have been the product of situational stress or malingering, and his symptoms had been effectively treated. *See, e.g.*, *United States v. Telles*, 18 F.4th 290, 300–01 (9th Cir. 2021) (explaining that malingering "behavior does nothing to demonstrate [a defendant's] inability to understand the proceedings or assist in his defense"). And while the medical professional declarations comment on the severity of Beeler's mental health issues, none of the declarations assert that his struggles interfered with his competency to stand trial.

The declarations from Beeler's fellow inmates provide a stronger causal connection between Beeler's mental health and his competency, but they do not render the California Supreme Court's denial of this issue unreasonable under AEDPA because they are merely conclusory lay opinions of Beeler's alleged incompetence. *See Alpha & Omega Dev., LP v. Whillock Contracting, Inc.*, 200 Cal. App. 4th 656, 664 (2011) (noting that "speculative" or "conclusory" declarations are insufficient to make a prima facie case under California law). The inmates were not medical professionals, did not attend any of Beeler's courtroom proceedings, and did not participate in any discussions between Beeler and counsel. Further, the declarations are refuted by Dr. Walker's testimony about Beeler's competence, Beeler's active participation in the case before the trial court, the absence of comment by any of the medical experts, and the lack of concern by both the trial court and defense counsel as to his competency. *See Medina*, 505 U.S. at 450; *Boyde v. Brown*, 404 F.3d 1159, 1167 (9th Cir. 2005) ("[T]he most telling evidence that [petitioner] was competent at trial is that neither defense counsel—who would have had every incentive to point out that his client was incapable of assisting with his defense—nor the trial court even hinted that [he] was incompetent."). Under deferential AEDPA review, we affirm the district court's denial of habeas relief on this claim.

## 3.

For counsel to be found ineffective for failing to raise a competency issue, there must have been "sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt the defendant's competency, and . . . a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised

and fully considered." *Stanley*, 633 F.3d at 862 (internal quotation marks omitted). Similar to substantive competency, "additional evidence submitted . . . [in a] state habeas petition is cognizable as to [an ineffective assistance of counsel] competency claim." *Michaels*, 51 F.4th at 943.

Beeler's ineffective assistance of counsel claim relies on the same evidence presented to support the procedural and substantive competency claims. As a result, his ineffective assistance of counsel claim fails for the same reasons. *Davis*, 384 F.3d at 647 ("In light of our evaluation of the substantive competence claim, [petitioner's] claim that his trial attorneys rendered ineffective assistance of counsel by failing to move for a competency hearing in the trial court also fails."); *see also Stanley*, 633 F.3d at 862–63 (holding that an ineffective assistance competency claim lacked merit where both the trial and post-conviction experts failed to conclude that petitioner was incompetent).

**4.**

Because the California Supreme Court could have reasonably concluded that Beeler's evidence of substantive and procedural incompetency did not establish a prima facie case, Beeler's claim that there should have been an evidentiary hearing on his competency claim also lacks merit. *See Pinholster*, 563 U.S. at 188 n.12; *Michaels*, 51 F.4th at 940 n.17. His claim that the district court was required to conduct a hearing fails for the same reason. *See Murray v. Schriro*, 882 F.3d 778, 802 (9th Cir. 2018) ("[S]o long as we are reviewing a petitioner's claim under AEDPA, our review is limited to the facts before the state court and the petitioner is not entitled to an evidentiary hearing in federal court.").

## B. Guilt and Penalty Phases Ineffective Assistance of Counsel Claims

Beeler argues that his counsel provided ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to investigate and present evidence regarding his "mental illness and [organic brain damage]" at both the guilt and penalty phases.

To succeed on this claim, the "defendant must show that counsel's representation fell below an objective standard of reasonableness" and prejudiced him, "considering all the circumstances." *Id.* at 687–88. Under this standard, "[c]ounsel in a death-penalty case has 'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Andrus v. Texas*, 590 U.S. 806, 814 (2020) (per curiam) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)). "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). Our examination of defense counsel's performance "must be highly deferential," *Strickland*, 466 U.S. at 689, and, when conducted through AEDPA's lens, our review of counsel performance is "doubly deferential," *Hardy v. Chappell*, 849 F.3d 803, 825 n.10 (9th Cir. 2016).

To show that the deficient performance was prejudicial, the defendant must establish that the alleged errors "actually had an adverse effect on the defense," meaning that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 693–94. "Establishing prejudice in the death sentence context requires a showing that 'there is a reasonable probability

that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Bible v. Ryan*, 571 F.3d 860, 870 (9th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695) (cleaned up). We do not apply "double deference" in the prejudice analysis. *Hardy*, 849 F.3d at 825 n.10.

Again, we conclude that the district court, under AEDPA review, correctly denied Beeler's ineffective assistance of counsel claim.

## 1.

Counsel consulted with five psychologists before trial, and two of those psychologists, Drs. Wells and Walker, recommended that Beeler also be evaluated by a neurologist. Dr. Walker declared that defense counsel had "represented to [her] that they had already petitioned the court for funds for the appointment of a neurologist, but their request was denied." On appeal, Beeler asserts that defense counsel had lied to Dr. Walker, but he provides no explanation or evidentiary support.

As discussed above, after receiving a death verdict, Beeler pressed defense counsel for neurological testing based on his newly reported head injury and frequency of blackouts. In response, counsel arranged for Dr. Arnold Starr, a neurologist, to interview Beeler. Dr. Starr reported that Beeler's "mental status would be in keeping with someone who was mentally slow with an IQ estimated to be 75 or 80." Dr. Starr also suggested a possible diagnosis of schizophrenia based on Beeler's history of trauma, institutionalizations, and self-reported auditory hallucinations. Accordingly, Dr. Starr recommended neurological testing, including a PET scan. Defense counsel had a PET scan conducted and hired Dr. Buchsbaum to

review the scan. Dr. Buschbaum determined that Beeler's PET scan indicated "brain damage or dysfunction." But the trial court denied the defense motion for an additional continuance to have a qualified neurologist review the scan.

About four years later, in connection with Beeler's first state habeas petition, he was evaluated by Dr. Jonathan Pincus, a neurologist, and Dr. Stephen Marmer, a psychiatrist. Dr. Pincus's report states that, after reviewing Beeler's medical and social history, as well as examining him, Dr. Pincus was "convinced that Mr. Beeler has brain damage." He opined that Beeler's reported blackouts "could be dissociative episodes or seizures," and recommended an 8-hour EEG in order to confirm a possible "diagnosis of epilepsy." Dr. Marmer also focused on Beeler's blackouts, concluding that Beeler suffers from multiple personality disorder, a type of dissociative disorder. He believed that "Beeler's host personality does not have control over the conduct of his alternate personalities and generally suffers from a blackout while alternate personalities are present." As a result, Dr. Marmer opined that it was highly probable that "Beeler's host personality was not . . . co-conscious at the time of the death of [Tony] Stevenson" or "the rape of Mrs. Doyle, if Beeler was present at all."

**2.**

Beeler first claims that defense counsel should have used penalty phase mitigation and extra-record evidence of his mental illness and brain damage at the guilt phase to show that he did not form the specific intent to kill. He argues that had defense counsel presented evidence showing that he lacked "the capacity to think clearly enough, in the panic of the moment, to form the specific intent to kill," the jury

would not have found true the burglary murder special circumstance.

But even assuming defense counsel performed deficiently in its investigation and presentation of evidence, Beeler was not prejudiced by counsel's decisions. *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

To the extent Beeler is arguing that his counsel should have presented a defense of diminished capacity, his argument fails because at the time of his trial, that defense was not allowed by California law. *Noguera v. Davis*, 5 F.4th 1020, 1048 (9th Cir. 2021) ("[B]ecause [the] murder took place after June 1982, a diminished capacity defense was unavailable to [petitioner] under California law."). As a result, defense counsel could have only used the mental health evidence to argue that Beeler did not form the specific intent to kill. Cal. Penal Code § 28 ("Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent . . . ."). Neither Beeler's trial experts nor post-trial experts, however, opined that his mental health issues prevented him from forming the intent to kill. These experts gave opinions only about compulsion, dissociation, epilepsy, and multiple personality disorder. As a result, without a nexus between Beeler's conditions and his specific intent, any mental health evidence would have been inadmissible at the guilt phase.

Moreover, the crime scene evidence strongly disputes a finding of lack of specific intent. Beeler's mental incapacity argument relies on the premise that the circumstances of the

crime—even without consideration of his mental health evidence—showed a lack of intent. While the defense theorized that Tony had been shot during a struggle inside the house, significant evidence established that Beeler shot Tony in the back as Tony fled from the house. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (holding that conclusory allegations that fail to explain how counsel could have rebutted overwhelming evidence of guilt are insufficient to warrant relief under *Strickland*). And defense counsel had in fact argued during trial that the killing was unintentional and done in the heat of the struggle. The jury chose the prosecution's view that the killing was intentional.

The penalty phase mental health evidence likely would not have changed the jury's determination, as it could have been easily rebutted. *See Andrews v. Davis*, 944 F.3d 1092, 1108–09 (9th Cir. 2019). Any evidence suggesting that Beeler had no memory of the killing due to a blackout or dissociation would have been contradicted by his post-crime activities, including his discussion of the crime with coworkers and efforts to create an alibi. Evidence of dissociation also could have opened the door to additional rebuttal, such as Beeler's bragging about his rape of Doyle despite a similar claim of having suffered a blackout during that crime. *See Bolin v. Davis*, 13 F.4th 797, 821 (9th Cir. 2021) (noting that, under California law, expert mental health testimony could have opened door to rebuttal evidence).

Similarly, the additional neurological evidence collected after trial could have been rebutted. Expert testimony suggesting that Beeler was suffering from a seizure or multiple personality disorder at the time of the crime would have been rebutted by his deliberate shooting of Tony, his furtive post-crime conduct, as well as the fact that Dr.

Walker never diagnosed Beeler as suffering from multiple personality disorder.  *See id.* at 816 (holding that "a reasonable jurist could conclude that [petitioner's] neurological deficits theory [wa]s of uncertain relevance to the offenses" and "unpersuasive" because it did not explain petitioner's "deliberate shooting of three people and his strategic thinking after the murders"); *Williams*, 384 F.3d at 617 (holding that counsel reasonably could have determined that "a defense of diminished mental capacity was not feasible" in part because "[t]he facts of the crimes reflected deliberate and methodical action").

Beeler points to juror declarations discussing what effect learning about Beeler's brain damage would have had on their assessment of his crimes and his failure to testify, but that evidence is barred by the no-impeachment rule.  *See* Fed. R. Evid. 606(b)(1) (prohibiting, subject to exceptions not applicable here, "a juror's affidavit or evidence of a juror's statement" regarding "the effect of anything on that juror's or another juror's vote[] or any juror's mental processes concerning the verdict"); *see also* Cal. Evid. Code § 1150(a) ("No evidence is admissible to show the effect of [a] statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.").  Further, the juror declarations merely state that the jurors thought the evidence of brain damage "would have explained more . . . about Mr. Beeler's actions" or "why [Beeler's] judgment was so impaired."  These are vague statements that do not affirmatively say that the evidence would have changed their verdict.

While Beeler was clearly not prejudiced, the California Supreme Court could have also determined that trial counsel acted reasonably and diligently during the guilt stage.  For

instance, trial counsel presented various defense theories, such as that another person shot Tony, which "indicate[d] active and capable advocacy." *Harrington*, 562 U.S. at 111.

And trial counsel's decision not to pursue a defense based on Beeler's alleged inability to form intent was not because defense counsel failed to investigate. Beeler argues that "numerous red flags" should have alerted counsel to the fact that he had brain damage, such as the abuse he suffered as a child, his impaired motor skills, his repeated institutionalizations, evidence of a head injury, signs of depression and memory lapses, and more. But the record shows that trial counsel heeded these "red flags," hiring numerous medical professionals to evaluate Beeler both before and after trial. Beeler does not provide any support for his assertion that defense counsel lied about unsuccessfully filing a pre-trial request for funds to hire a neurologist. In fact, the evidence shows that counsel diligently attempted to pursue the issue when Beeler volunteered new information before sentencing. But as discussed above, this evidence would not have been helpful to Beeler at the guilt phase, so counsel's decision not to present it does not show deficient performance. Accordingly, we affirm the denial of habeas relief as to Beeler's claim of a *Strickland* violation at the guilt phase.

## 3.

Beeler also claims that the neurological evidence not presented at the penalty phase would have constituted additional mitigation, and there is a reasonable probability that one juror would have made a different decision based on

that evidence.**[4]** Just as with Beeler's claim of guilt-phase ineffective assistance of counsel, the California Supreme Court could have reasonably determined that defense counsel's performance was not deficient, as counsel diligently sought neurological testing both before trial and after Beeler volunteered new information. *See Demetrulias v. Davis*, 14 F.4th 898, 915 (9th Cir. 2021) ("Because we conclude that [counsel's] performance was not deficient, we need not address whether [the petitioner] was prejudiced by any deficiency.").

The California Supreme Court could have also reasonably determined that even if counsel had lacked diligence, counsel's failures did not prejudice Beeler. The additional neurological testing would have done little to explain or excuse Tony's killing. Dr. Starr, the neurologist who interviewed Beeler prior to sentencing, stated that testing was needed to offer an affirmative diagnosis regarding organic brain damage. Dr. Buchsbaum, who determined that Beeler's PET scan "indicated . . . brain damage or dysfunction," was a psychiatrist and did not offer a neurological diagnosis. Dr. Pincus, who evaluated Beeler

---

[4] As an initial matter, the parties dispute which California Supreme Court ruling we should review for this claim. Beeler asserts that this court should "look through" that California Supreme Court's 2004 summary denial and review the reasoning of the California Supreme Court's direct appeal opinion while still taking into account "the additional supporting evidence" presented on state habeas. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (holding that a federal habeas court should "look through" an unexplained state court decision and apply AEDPA deference to "the last related state-court decision that does provide a relevant rationale"). But "the operative decision is the California Supreme Court's summary denial because its decision on direct review did not address [Beeler's] more fully developed claim . . . ." *Cain v. Chappell*, 870 F.3d 1003, 1018 n.5 (9th Cir. 2017).

for his state habeas petitions, concluded that Beeler has organic brain damage, but he also qualified its impact on Beeler and recommended additional testing to confirm a possible diagnosis of epilepsy. *See Runningeagle v. Ryan*, 825 F.3d 970, 987–88 (9th Cir. 2016) (concluding that mental health reports were "not of material mitigating weight" because the experts "used qualifying language" and "gave no affirmative diagnosis").

Dr. Marmer's diagnosis of multiple personality disorder could have also been refuted by Dr. Walker's assessment and findings that Beeler understood the nature of his actions. The jury likely would have accorded little weight to this speculative and indefinite evidence. *Apelt v. Ryan*, 878 F.3d 800, 834 (9th Cir. 2017) (determining that an ineffective assistance mitigation claim failed for lack of prejudice in part because "none of the proffered mitigating evidence excuse[d] [the petitioner's] callousness" or "reduce[d] [his] responsibility for planning and carrying out the murder").

More importantly, defense counsel presented an extensive mitigation case. Through the testimony of nineteen lay and expert witnesses, defense counsel offered classic and substantial mitigation evidence regarding Beeler's severe childhood abuse, mental health issues, positive character, and institutional adjustment. *See Avena*, 932 F.3d at 1249 ("[T]estimony by character witnesses and the presentation of a defendant's social history and background play a fundamental role in securing confidence in the outcome of the penalty phase."); *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) (concluding it was reasonable for counsel to rely on an "institutional adjustment" theory for mitigation without also presenting brain dysfunction or psychiatric testimony); *cf. Summerlin v. Schriro*, 427 F.3d 623, 635 (9th Cir. 2005) (en banc) (noting

that counsel failed to present "available classic mitigation evidence concerning family history, abuse, … and mental disorders"). And contrary to Beeler's assertion, trial counsel provided extensive evidence of his social history. Given the relative weakness of the unpresented evidence, combined with counsel's extensive mitigation presentation, the neurological evidence likely would not have affected the jury's balancing of the aggravating and mitigating circumstances.

As a result, Beeler failed to establish a prima facie case as to the ineffective assistance of counsel at the penalty phase, and the California Supreme Court's summary denial of this claim was reasonable.

**4.**

Finally, as with the competency claim, Beeler asserts that he established a prima facie case, so the California Supreme Court's summary denial of his ineffective assistance claims was unreasonable. As discussed, Beeler's ineffective assistance claims lack merit, so the California Supreme Court reasonably denied relief, and no federal hearing was required under AEDPA. *See Pinholster*, 563 U.S. at 188 n.12; *Michaels*, 51 F.4th at 940 n.17; *Murray*, 882 F.3d at 802. We therefore affirm the denial of habeas relief as to all of Beeler's claims of ineffective assistance of counsel.

### C. Coercion of Death Verdict Claim

Beeler alleges that the trial court coerced the jury's death verdict by failing to replace a juror, Michael C., with an alternate after Michael C. informed the court of his father's sudden death. According to Beeler, the trial court placed the jury in the "suddenly intensified" position of either reaching a verdict during a truncated morning deliberation session, or

"fac[ing] . . . the prospect of their service being extended" until Michael C. returned from his father's funeral the following week. Applying AEDPA review, we find that the California Supreme Court neither erroneously applied federal law nor made an unreasonable determination.

**1.**

Before the start of the third day of jury deliberations on Tuesday, July 12, 1988, Michael C. called the court clerk to explain that his father had suddenly died and he had scheduled a flight for 2 p.m. that afternoon. The attorneys were informed of the dilemma but were delayed at another courthouse, so at 10:00 a.m., the court met with Michael C. ex parte to discuss the issue. The court instructed Michael C. to continue deliberations, which would be recessed "sometime before noon" in order to allow him to leave for the airport. The court also instructed Michael C. that deliberations would resume on the following Monday, July 18, when he was scheduled to return from his father's funeral. Michael C. then returned to the jury room to deliberate, and the trial court did not pass along any further instructions or information to the rest of the jury.

The attorneys arrived shortly thereafter. Outside the presence of the jury, the court relayed its decision, to which counsel then objected and requested that Michael C. be replaced with an alternate. Defense counsel argued that "the jury may feel some sense of urgency in reaching a verdict today" because "if they have to come back next week that's going to put them beyond" the court's earlier estimate that the case would not extend past the middle of July. Counsel also expressed concern that the court had failed to inquire into Michael C.'s emotional state or admonish him and the

other jurors to refrain from quickly reaching a verdict in order to avoid returning the following week.

In declining to appoint an alternate, the trial court explained that keeping Michael C. on the jury would result in only a two-day delay in deliberations in light of Beeler having a medical appointment that afternoon and Friday being an off-day. The court also stated that it would reconvene the jury at 11:00 a.m. The jury, however, reached its death verdict before 11:00 a.m.

Prior to reading the verdict, with counsel and the jury present, the trial court inquired of the jury foreman whether the jurors felt pressure to reach a decision due to Michael C.'s situation. The jury foreman responded negatively. The trial court further probed, "if any juror now feels that they need additional time to discuss the case or reconsider the verdict because of the pressure of time, I'll hear from any juror." After receiving no response, the trial court then requested that any juror who had such a feeling to "please raise your hand." None of the jurors raised a hand. The trial court continued to press, asking whether the fact that Michael C. was going to be excused and there was a probability that deliberations would not resume until the following Monday had anything to do with the verdict the jury reached. The jury foreman again answered, "no." The trial court asked the jurors whether anyone felt "differently than that, that there might be some impropriety in the verdict because of the press of time? If so, please raise your hand." Again, no juror raised a hand or voiced any disagreement. The trial court then proceeded with reading the jury's death verdict. After the verdict was read, the trial court inquired whether this was the jury's verdict which, in unison, the jury affirmed. The court then individually polled each member

of the jury, and each answered affirmatively that the verdict read was his or her verdict.

On direct appeal, Beeler claimed that Michael C.'s presence on the jury resulted in a coerced penalty-phase verdict. The California Supreme Court rejected this contention, holding that the trial court did not abuse its discretion in denying Beeler's request to excuse the juror. Beeler again raised the issue as part of his second state habeas petition, which he supplemented with declarations from jury members. For instance, juror Catherine A. declared that

> On the last day of our deliberations, a juror came in and told the rest of us that his father had passed away and that he had to leave that afternoon for the funeral. He stated that we should get this done and urged us to reach a verdict that day because if we did not, we would have to introduce an alternate to our deliberations and everything would get more complicated.

And Harold W. stated that after four days of deliberations,

> I did not want to hold everything up if I could not convince others of my positions. . . . I told my fellow jurors that I just did not feel it was right to give Mr. Beeler the death penalty. But everyone knew I was the one holding up the verdict, and given the

situation, I did not feel like I could take any
more of the jurors' time.

Lois L. recalled that the penalty deliberations had been
going on for days without any consensus. But on the
morning her fellow juror had a death in the family, the jurors
came to a unanimous decision on the first vote. Similarly,
Walter P. said that the verdict and sentence were just but also
recalled that the jury reached a verdict quickly after learning
that a juror needed to leave to attend a funeral.

**2.**

As a threshold issue, the parties dispute whether AEDPA
deference or de novo review applies to this issue. Beeler
asserts the last reasoned decision is the California Supreme
Court's majority opinion on direct appeal, as the denial on
state habeas merely stated that his claim failed procedurally
and on the merits. *Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir.
2020) ("When the state's highest court does not provide
reasoning for its decision, a federal habeas court may 'look
through the unexplained decision to the last related state-
court decision that does provide a relevant rationale' and
'presume that the unexplained decision adopted the same
reasoning.'" (quoting *Wilson*, 584 U.S. at 125)). Because
the majority opinion on direct appeal failed to address the
federal aspect of his claim, Beeler argues that de novo
review applies. *See Pirtle v. Morgan*, 313 F.3d 1160, 1167
(9th Cir. 2002) ("[W]hen it is clear that a state court has not
reached the merits of a properly raised issue, we must review
it de novo.").

The State disagrees on two points. First, the State argues
that the look through doctrine is inapplicable because the
California Supreme Court clearly denied the claim on

different grounds on state habeas than it did on direct appeal. *See Kernan v. Hinojosa*, 578 U.S. 412, 415 (2016) ("It quite obviously rested upon some different ground. [The] 'look-through' approach is therefore inapplicable."). Second, even looking through to the opinion on direct appeal, the California Supreme Court's majority necessarily rejected the federal aspect of the claim, so AEDPA deference is appropriate.[5]

The State is correct that Beeler's jury coercion claim was denied on the merits on state habeas, and "AEDPA deference 'applies even where there has been a summary denial.'" *Ochoa*, 50 F.4th at 888 (quoting *Pinholster*, 563 U.S. at 187). As a result, even if we "look through" to the majority opinion

---

[5] The State contends the claim is procedurally barred due to the California Supreme Court's alternative untimeliness determination. The California Supreme Court did not explain why it found this claim untimely. If the claim was not altered, the state's time-bar ruling does not constitute a procedural bar or affect the proper exhaustion of the claim on direct appeal. *See Koerner v. Grigas*, 328 F.3d 1039, 1053 (9th Cir. 2003) ("A claim cannot be both previously litigated and procedurally defaulted; either it was raised in a prior proceeding or it was not."). It is therefore likely that the California Supreme Court deemed Beeler's addition of the juror declarations to have altered the claim such that the procedural bar applies.

We have not resolved the question of whether the addition of evidence changes a claim. *See Reno v. Davis*, 46 F.4th 821, 831 n.4 (9th Cir. 2022), *cert. denied sub nom. Reno v. Broomfield*, 144 S. Ct. 119 (2023) (stating that where the state contended that new evidence changed the claim, this court did "not resolve this question" because it found that the claim did not survive AEDPA review on the merits). We need not resolve it here because, regardless, the claim does not survive review on the merits even with the additional evidence. *See Apelt*, 878 F.3d at 825 ("[W]hen a state court 'double-barrels' its decision—holding that a claim was procedurally barred and denying the claim on its merits—both its procedural default ruling and its merits ruling are entitled to deferential review by federal courts, as intended by AEDPA.").

on direct appeal to fill in the summary denial on habeas, we must apply deference to the underlying reasoning. *Wilson*, 584 U.S. at 125 (explaining that a federal habeas court should "look through" an unexplained state court decision and apply AEDPA deference to "the last related state-court decision that does provide a relevant rationale").

Moreover, Beeler's argument that we should "look through" to the majority opinion on direct appeal is incompatible with Beeler's claim that the California Supreme Court has failed to address his constitutional claim entirely. While the look-through doctrine instructs that we should rely on the reasoning provided in an earlier ruling to fill the gaps of an unreasoned opinion, *Kipp*, 971 F.3d at 948, Beeler asks that we look through the summary denial on state habeas to conclude that the preceding opinion on direct appeal had *no* reasoning. Beeler cites no legal support for such a maneuver. Absent such showing, we apply the traditional analysis called for by AEDPA, "consider[ing] what arguments or theories could have supported the state court's summary denial." *Montiel*, 43 F.4th at 958 (citing *Richter*, 562 U.S. at 96, 102).

Even if we were to "look through" to the majority opinion on direct appeal, that opinion does not establish that the California Supreme Court failed to address the federal claim. "[W]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Johnson v. Williams*, 568 U.S. 289, 298 (2013) (quoting *Richter*, 562 U.S. at 99). The presumption, often referred to as the "*Richter* presumption," is "strong but rebuttable." *Id.* at 301. "We adhere to this 'strong' presumption because 'it is not the

uniform practice of busy state courts to discuss separately every single claim to which a defendant makes even a passing reference.'" *Sherman v. Gittere*, 92 F.4th 868, 875–76 (9th Cir. 2024) (quoting *Johnson*, 568 U.S. at 298). As a result, federal habeas law "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Johnson*, 568 U.S. at 298 (quoting *Richter*, 562 U.S. at 100).

To be sure, this presumption can "rebutted" in "limited" or "unusual circumstances." *Id.* at 301–02. "Thus, for example, the presumption doesn't hold if the federal claim was 'rejected as a result of sheer inadvertence.'" *Sherman*, 92 F.4th at 876 (quoting *Johnson*, 568 U.S. at 302–03). But "'the evidence' must 'very clearly' lead to 'the conclusion that a federal claim was inadvertently overlooked in state court.'" *Id.* (quoting *Johnson*, 568 U.S. at 303).

Beeler points to Justice Kennard's dissent as proof that the majority failed to consider the federal law. Justice Kennard criticized the majority for "analyz[ing] the trial court's conduct . . . solely in terms of [California] Penal Code section 1089 . . . . More fundamental constitutional rights, however, are also implicated by the trial court's course of action." *Beeler*, 9 Cal. 4th at 1012. While Justice Kennard is correct that the majority opinion focused on Penal Code § 1089, *see id.* at 989, that does not necessarily lead to the conclusion that the federal claim was overlooked. The California Supreme Court may have simply regarded the claim as "too insubstantial to merit discussion." *See Johnson*, 568 U.S. at 299. Indeed, it may very well be that the dissent's criticism merely shows that the majority decided against writing on the federal claim in its opinion, not that the majority overlooked the issue.

Moreover, we cannot say the California Supreme Court "inadvertently overlooked" the issue when Justice Kennard's dissent, as Beeler himself recognizes, brought it to the attention of the California Supreme Court.[6] And for us to conclude that a line in a dissent speaks for the majority is not only unprecedented, but in the habeas context, upends the AEDPA deference we owe the majority opinion. We therefore conclude that the California Supreme Court addressed Beeler's Sixth Amendment jury coercion claim on the merits and apply AEDPA deference.

### 3.

"Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). Whether "the trial court's actions and inactions were noncoercive" should be assessed "individually and cumulatively." *Early v. Packer*, 537 U.S. 3, 9 (2002).

Beeler points to several cases, but none shows that the California Supreme Court unreasonably applied clearly established federal law. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the defendant]'s favor, 'it cannot be said that the state court unreasonably applied clearly established Federal law.'" (cleaned up) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006))). Beeler cites *Shields v. United States*, 273 U.S. 583, 587 (1927) to argue that there is coercion if the trial court's direction to the jury

---

[6] In fact, it is likely that the issue was deliberated by the Justices. *See generally* Justice Goodwin Liu, *How the California Supreme Court Actually Works: A Reply to Professor Bussel*, 61 UCLA L. Rev. 1246, 1255 (2014) (detailing the California Supreme Court's unique and intensive "deliberative process" of issuing opinions).

caused the jury to render a verdict "which they were plainly reluctant to return." But *Shields* concerned a district court's ex parte instruction to a deadlocked jury to continue deliberating, which violated the defendant's right "to be present from the time the jury is impaneled until its discharge after rendering the verdict." 273 U.S. at 584–85, 588–89. It did not concern a defendant's Sixth Amendment right to an uncoerced jury.

Beeler also cites to *Jenkins v. United States*, 380 U.S. 445 (1965) (per curiam) and *United States v. United States Gypsum Co.*, 438 U.S. 422 (1978), but they are factually distinct. In *Jenkins*, the Supreme Court held that the district court coerced the deadlocked jury's verdict by demanding that, "You have got to reach a decision in this case" after they had been deliberating for only two hours. 380 U.S. at 446. And in *Gypsum Co.*, the jury foreman had an ex parte discussion with the judge about the deteriorating health of the jurors and the jury's deadlock, and the trial court's stern response gave the foreman the impression that there must be a verdict "one way or the other." 438 U.S. at 432. In contrast, the jury here never indicated that it was deadlocked, there was no supplemental instruction requiring the jury to reach a verdict, and the trial court did not indicate the jury was taking too long. To the contrary, the trial court repeatedly confirmed that the verdict was reached unanimously and voluntarily and was not rushed.

Additionally, because neither *Shields*, *Jenkins*, nor *Gypsum Co.* were decided on constitutional grounds, Beeler cannot rely on them under AEDPA. *See Rushen v. Spain*, 464 U.S. 114, 119 n.4 (1983) (explaining that *Shields* was decided on non-constitutionally based rules of orderly trial procedure); *Early*, 537 U.S. at 10 ("Neither *Jenkins* nor *Gypsum Co.* is relevant to the § 2254(d)(1) determination,

since neither case sets forth a rule applicable to state-court proceedings. . . . [N]either opinion purported to interpret any provision of the Constitution. That alone would be enough to defeat a claim that their application to state-court proceedings is 'clearly established.'"). We thus affirm the district court's denial of Beeler's jury coercion claim.[7]

## D. California's Death Eligibility Process

Beeler's last uncertified claim argues that California fails to adequately narrow the pool of defendants eligible for the death penalty under the 1978 statute. This argument is foreclosed. *See Karis v. Calderon*, 283 F.3d 1117, 1141 n.11 (9th Cir. 2002) (rejecting "argument that [California's sentencing] scheme does not adequately narrow the class of persons eligible for the death penalty"); *Mayfield v. Woodford*, 270 F.3d 915, 924 (9th Cir. 2001) (denying a certificate of appealability because "[a] reasonable jurist could not debate . . . that the 1978 California statute, which narrowed the class of death-eligible defendants at both the guilt and penalty phases, was constitutional"). We affirm the denial of this claim.

---

[7] The California Supreme Court also could have reasonably found that the evidence does not amount to coercion. The trial court surveyed the jurors multiple times to ensure that there was no "impropriety in the verdict because of the press of time." And none of the jurors claimed that the delay *caused* them to change their vote. The most serious declaration came from juror Harold W., who stated that he switched his vote because he "did not want to hold everything up if [he] could not convince others" to choose life without the possibility of parole and "given the situation, [he] did not feel like [he] could take any more of the jurors' time." But Harold W. did not say whether the "situation" had to do with Michael C.'s family tragedy as opposed to feeling that no one else would agree with him or that he was coerced into changing his vote.

## IV.  CONCLUSION

We affirm the district court's denial of Beeler's petition for a writ of habeas corpus.

**AFFIRMED.**